UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

PARK WEST GALLERIES, INC.                    Case No. 12-cv-3007 (CM)
                                             ECF CASE
            Plaintiff,

      -against-                              **NOTICE OF REMOVAL**

THERESA FRANKS, an individual, GLOBAL
FINE ART REGISTRY, LLC d/b/a FINE ART
REGISTRY, and JOHN DOES 1-10,

            Defendants.
---------------------------------------------------------------X

      THERESA FRANKS and GLOBAL FINE ART REGISTRY, LLC, d/b/a FINE ART

REGISTRY ("FAR") file this Notice of Removal to the United States District Court for the

Southern District of New York of the above-described action from the Supreme Court of New

York, County of New York, where the action is now pending, and state:

      1.     Park West Galleries, Inc. has sued Theresa Franks, FAR, and ten unidentified

"John Does" in the Supreme Court of the State of New York, County of New York.  True and

correct copies of all documents filed in that action are attached hereto as Exhibit A.

      2.     This action is one of eleven nearly identical lawsuits filed by Plaintiff Park West

Galleries, Inc. against FAR and Franks in different state courts across the country.

      3.     This action was filed on March 7, 2012.  See Exhibit A.

      4.     Theresa Franks and FAR received notice of the suit on March 15, 2012.

      5.     Plaintiff Park West Galleries, Inc. seeks damages in excess of $75,000.00

exclusive of interest, attorney's fees and costs.

      6.     Plaintiff Park West Galleries, Inc. is a Michigan Corporation, with its principal

place of business located at 29469 Northwestern Hwy., Southfield, Michigan 48034.

7.     Defendant Theresa Franks is an Arizona resident.

8.     Defendant FAR is an Arizona Limited Liability Company which operates an Arizona based website located at http://www.fineartregistry.com.

9.     Co-Defendants "John Does 1 through 10" are unidentified and undetermined persons or entities.

10.    This petition for removal was filed within thirty (30) days of the date on which Theresa Franks and FAR became aware of the lawsuit.

11.    28 U.S.C. §§1332(a)(1) provides in pertinent part that:

> "[t]he district court shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states...."

12.    Pursuant to 28 U.S.C. §1441(a), an action may be removed from the New York State Court System to the United States District Court for the Southern District of New York where the requirements of 28 U.S.C. § 1332(a)(1) are met.

13.    Pursuant to 28 U.S.C. § 1332, as the amount in controversy is in excess of $75,000.00 and since the parties citizenship is diverse, this action could have originally been brought in the United States District Court for the Southern District of New York.

14.    Pursuant to 28 U.S.C. § 1441, as this Court has original jurisdiction over this action, removal is proper.

15.    The Defendants will give written notice of the filing of this notice to the Plaintiff as required by 28 U.S.C. § 1446(d).

16.    A copy of this notice will be filed with the clerk of the Supreme Court of New York, County of New York, as required by 28 U.S.C. § 1446(d).

WHEREFORE, the Defendants request that this action proceed in this Court as an action properly removed to it.

Dated: New York, New York
      April 12, 2012

**LEVINE DESANTIS, P.C.**
*Attorneys for Defendants Theresa Franks and Global Fine Art Registry, LLC d/b/a Fine Art Registry*

By: _____

ANTHONY N. GAETA, ESQ.
5 Penn Plaza, 23rd Floor
New York, New York 10001
(212) 835-1648
agaeta@levinedesantis.com

# EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PARK WEST GALLERIES, INC., | Index No.: |
| **Plaintiff,** | Plaintiff designates **New York County** as the place of trial. The basis of venue is: CPLR § 503(a) |
| -against- | **SUMMONS** |
| THERESA FRANKS, an individual, and GLOBAL FINE ART REGISTRY, L.L.C. D/B/A FINE ART REGISTRY, JOHN DOES 1-10, | |
| **Defendants.** | |

To the above named Defendants:

Theresa Franks                         Global Fine Art Registry, L.L.C. d/b/a Fine Art Registry
8233 West Country Gables Drive         5350 West Bell Road, Suite C-22,
Peoria, AZ 85381                       Glendale, AZ 85308

*You are hereby summoned* to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorneys within 20 da ys after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       March 7, 2012

                              McCUSKER, ANSELMI,
                              ROSEN, CARVELLI P.C.
                              805 Third Avenue, 12th Floor
                              New York, New York 10022
                              (212) 308-0070
                              *Attorneys for Plaintiff Plaintiff*
                              *Park West Galleries, Inc.*

                              By: _____
                                    Michael R. Futterman

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------x

PARK WEST GALLERIES, INC.,

                    Plaintiff/Petitioner,

            - against -                                    Index No. 650696/2012

THERESA FRANKS, an Individual, and GLOBAL FINE
ART REGISTRY, LLC D/B/A FINE ART REGISTRY,
JOHN DOES 1-10

                    Defendant/Respondent.

----------------------------------------------------------x

## NOTICE OF COMMENCEMENT OF ACTION
## SUBJECT TO MANDATORY ELECTRONIC FILING

        PLEASE TAKE NOTICE that the matter captioned above, which has been commenced by filing of the
accompanying documents with the County Clerk, is subject to mandatory electronic filing pursuant to Section 202.5-bb
of the Uniform Rules for the Trial Courts. This notice is being served as required by Subdivision (b) (3) of that
Section.

        The New York State Courts Electronic Filing System ("NYSCEF") is designed for the electronic filing of
documents with the County Clerk and the court and for the electronic service of those documents, court documents,
and court notices upon counsel and self-represented parties. Counsel and/or parties who do not notify the court of a
claimed exemption (see below) as required by Section 202.5-bb(e) must immediately record their representation within
the e-filed matter on the Consent page in NYSCEF. Failure to do so may result in an inability to receive electronic
notice of document filings.

        Exemptions from mandatory e-filing are limited to: 1) attorneys who certify in good faith that they lack the
computer equipment and (along with all employees) the requisite knowledge to comply; and 2) self-represented parties
who choose not to participate in e-filing. For additional information about electronic filing, including access to Section
202.5-bb, consult the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center at 646-
386-3033 or efile@courts.state.ny.us.

Dated: 03/07/2012

_____ (Signature)        805 Third Avenue, 12th Flr._____ (Address)
                                            New York, NY 10022
Michael R. Futtterman
_____ (Name)             _____

McCusker, Anselmi, Rosen & Carvelli,       212.308.0070
P.C.                                        _____ (Phone)
_____ (Firm Name)
                                            mfutterman@marc-law.com (E-Mail)


To:     THERESA FRANKS                      GLOBAL FINE ART REGISTRY
        8233 West Country                   d/b/a Fine Art Registry
        Gables Drive                        5350 West Bell Road, STe. C22
        Peoria, AZ 85381                    Glendale, AZ  85308

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------X

PARK WEST GALLERIES, INC.,        :

                                   :     Index No.

          **Plaintiff,**          :

                                   :

     **-against-**            :     <u>COMPLAINT</u>

                                   :

THERESA FRANKS, an individual, and  :

GLOBAL FINE ART REGISTRY, L.L.C.  :

D/B/A FINE ART REGISTRY, JOHN    :

DOES 1-10,                     :

                                   :

       **Defendant.**         :

-------------------------------------------------X

Plaintiff Park West Galleries, Inc., by its attorneys, McCusker Anselmi Rosen &

Carvelli, P.C., as and for its Complaint against defendants Theresa Franks and Global Fine Art

Registry, L.L.C. d/b/a Fine Art Registry, alleges as follows:

### Parties

1.     Plaintiff Park West Galleries, Inc. is a Michigan corporation doing business in

Oakland, Michigan.

2.     Defendant Global Fine Art Registry, L.L.C. d/b/a Fine Art Registry ("FAR") is an

Arizona limited liability company that is owned by Global Fine Art Registry. FAR operates a

website which is located at http://www.fineartregistry.com. FAR claims that it is dedicated to

exposing art fraud and improper practices in the art industry. In fact, FAR is dedicated to

attacking Park West and its artwork, executives (including founder Albert Scaglione), and

business practices.

3.     Defendant Theresa Franks is a resident of Arizona and is the founder and operator

of FAR. Franks is also the author of an internet blog located at

http://fineartregistry.blogspot.com.n Franks and FAR are one and the same as Franks is

completely and solely responsible for the content of FAR.

4.    John Does 1 to 10 are fictitious individuals, businesses and/or corporations who participated in the actions, and/or related actions, described herein.

5.    Franks and FAR are subject to personal jurisdiction in New York because they have committed tortious acts in this State, including, but not limited to, the claims set forth herein.

## COMMON ALLEGATIONS

6.    Defendants Franks and FAR over the course of several years have embarked on a sustained, malicious and outrageous cyber-smear campaign against Park West, its artwork, artists, executives, auctioneers and general business practices all in a calculated and intentional effort to interfere with Park West's present and potential business relationships with clients and customers.

7.    Defendants have executed their scheme through misleading, inaccurate and outrageous statements made in various publications including websites, blogs and YouTube videos targeted at Park West's current and potential clients and customers. As but one example, after Park West prevailed in litigation brought against it by former customers who, agitated and urged on by Defendants, claimed Park West had sold them overpriced art, Park West sought, as was its right under contracts signed by the former customers, recovery of its attorneys' fees and costs. In response, Franks, writing on her FAR blog, accused Park West of "tortur[ing] its customers," associating Park West's business practices with "waterboarding." Franks wrote that Park West "and its dastardly lawyers ... viciously (if not desperately and stupidly) attack[ed] art fraud victims who had filed suits against [Park West]."

8.    Franks continued that Park West's conduct was "all about vengeance, bitterness

and hatred." She said Park West's conduct demonstrated a level of "arrogance" that was "astonishing" especially because, she wrote, "valid claims of fraud are made and then proven by overwhelming evidence and expert testimony" – a statement that is demonstrably false.

9. Franks actively encourages Park West customers to cancel or negate their contracts: "[I]t is highly recommended that you **refuse** and **run** the other way as fast as you can and don't look back." She has written that Park West artwork is "forged, defaced and grossly overpriced," but Park West's contracts protect Park West. She stated that Park West's art inventory is "fraudulent" and that Park West "is determined to make [its purported] victims pay in more ways than one." A copy of Franks' most recent blog-post quoted herein is attached as exhibit 1.

10. Franks' recent blog-post is part and parcel of a prolonged and malicious campaign by Franks against Park West that includes a long and sordid history of inaccurate, unfair, and malicious attacks on Park West and its executives, artwork, auctioneers and practices. Franks conduct is designed to, and has, generated unjustified and unwarranted ill will towards Park West.

11. For instance, in May 2011, Franks, referring to "Park West Gallery and its thugs" posted that Park West "never plays fair (an understatement, we know)." She continued that Park West "wantonly ... infring[es] the intellectual property rights of others."

12. Franks' outrageous and malicious statements about Park West continued:

Park West Gallery is more notorious for its aggressive and thug-like litigation tactics than they are for the spurious artwork ... they peddle – not to mention all the other shenanigans and underhanded tricks they pull or have pulled in the past ... and which continue to this today.

(Franks' May 6, 2011 blog post, attached as exhibit 2.)

13. Franks noted in her May 2011 blog post that she has accused Park West of

misconduct "for the last four years." Indeed, since at least August 2007, Franks has engaged in a sustained and aggressive cyber-smear campaign against Park West and repeatedly denigrated without justification Park West and its executives (including Park West CEO Albert Scaglione, who is a frequent target of Franks' broadsides), artwork, auctions and business practices. Franks, via her FAR web-portal, has stated:

        a. Park West customers suffer a "horrific experience";

        b. Park West "financially rape[s]" customers;

        c. Park West engages in "deceptive and unfair trade practices";

        d. "Park West ... salesman [make] false and misleading representations";

        e. Potential Park West customers "can't rely on a word that comes out of the mouth of Park West ... salesmen and especially the fork-tongued lead salesman, Morris Shapiro";

        f. Park West appraisals are "bogus";

        g. "Park West [has] lied to its customers for many years";

        h. "Park West ... auctioneers/salesmen really stick it to the buyer";

        i. "Park West ... preys on the first-time art buyer";

        j. "Park West ... salesmen/auctioneers will lie through their teeth to make a sale";

        k. Individuals who purchase from Park West are making a "big mistake";

        l. Park West's art collection is "dog food";

        m. Park West's provenance documentation constitutes "cheesy photocopies [and] data forgeries";

(See May 25, 2011, FAR blog-post, attached as exhibit 3.)

      14.    Franks and FAR have accused Park West of "vicious and vindictive treatment" of Park West customers and of "getting away with murder." (See May 9, 2011, FAR blog-post, attached as exhibit 4.) Franks and FAR have stated that Park West's CEO and founder Albert

Scaglione "is desolate of integrity and scruples." (*Id.*)

15. As stated, Franks and FAR's constant malicious, false and improper conduct, including their sustained cyber-smear campaign have been on-going for several years. As of February 29, 2012, a review of FAR's website reflects that Franks and FAR have published approximately 264 blog posts all critical of Park West and of a piece with the statements quoted above. In addition, Franks and FAR have published many YouTube videos improperly and unfairly critical of Park West, its artwork, auctioneers and business practices.

16. For example, on September 16, 2009, Franks and FAR published statements that the provenance of Park West artwork was "complicated, convoluted, complex and confusing" so that customers cannot assess its veracity: "The Park West provenance is meant to confuse. The more perplexing the provenance, the less chance that anyone will figure out the sleight of hand. They bank on the fact that no one will be the wiser - that no one has the energy to take the time to unwind the tangled web - with the exception of Fine Art Registry and its experts, of course, who have figured it out much to the frustration of Park West."

17. Not surprisingly – indeed, as intended by Defendants – Defendants' constant improper, malicious and unfair conduct targeting Park West has caused many Park West customers residing in New York to cancel contracts to purchase artwork.

18. In all, thirty-four (34) clients, residing in New York, representing thirty-four (34) contracts with a face value of $477,547.13, cancelled their contracts after direct contact with Defendants whether through review of Defendants' cyber-smear materials, email communications, telephone contact, or all.

19. Defendants have directed their conduct specifically to customers in New York by publishing their cyber-materials here, by emailing Park West customers who reside in New

York, by calling New York customers, or all.

20.   All conditions precedent to the maintenance of this action have occurred or been waived.

## COUNT I
## (TORTIOUS INTERFERENCE WITH
## CONTRACTUAL AND BUSINESS RELATIONSHIPS)

21.   Park West realleges and incorporates by reference the common allegations as though fully set forth herein.

22.   Park West had valuable contractual and business relationships with New York clients.

23.   Park West had existing and prospective legal rights pursuant to existing contractual relationships with New York clients.

24.   Defendants had knowledge of Park West's contractual and business relationships with clients including those contracts identified herein.

25.   Defendants intentionally, maliciously and without justification interfered with Park West's relationships with these clients. Indeed, the very purpose of Defendants' conduct was to undermine and destroy Park West's relationships with all its clients including the New York clients at issue here.

26.   Defendants tortiously interfered with Park West's contractual relationships by making improper, malicious, repeated, and false accusations about Park West and its artwork, business practices, executives and auctioneers.

27.   Defendants' conduct was unprivileged, improper and malicious.

28.   Defendants' conduct was intended to and did severely and irreparably interfere with Park West's contractual relationships with New York clients, including without limitation

those clients identified above.

29. As a direct and proximate result of Defendants' conduct, Park West has suffered damages. Park West is entitled to recover such damages from Defendants.

WHEREFORE, Park West respectfully demands judgment in its favor and against defendants as follows:

      A. Awarding plaintiff compensatory, consequential and incidental damages;

      B. Awarding plaintiff punitive damages;

      C. Awarding plaintiff pre-judgment and post-judgment interest;

      D. Awarding plaintiff attorneys' fees and costs; and

      E. Awarding plaintiff such other and further relief as this Court deems equitable and just.

## COUNT II
## (TORTIOUS INTERFERENCE WITH
## ADVANTAGEOUS BUSINESS RELATIONSHIP)

30. Park West realleges and incorporates by reference the common allegations as though fully set forth herein.

31. Park West had valuable business relationships, not evidenced by contracts with New York clients who have purchased artwork from Park West.

32. Defendants had knowledge of Park West's advantageous business relationships with New York customers.

33. Defendants intentionally, maliciously and without justification interfered with Park West's advantageous relationships. Indeed, the very purpose of Defendants conduct was to undermine and destroy Park West's relationships with all its New York customers.

34. Defendants tortiously interfered with Park West's advantageous business

relationships by making improper, malicious, repeated, and false accusations about Park West and its artwork, business practices, executives and auctioneers.

35.    Defendants' conduct was unprivileged, improper and malicious.

36.    Defendants' conduct was intended to and did severely and irreparably interfere with Park West's advantageous business relationships with New York customers.

37.    As a direct and proximate result of Defendants' conduct, Park West has suffered damages. Park West is entitled to recover such damages from Defendants.

WHEREFORE, Park West respectfully demands judgment in its favor and against defendants as follows:

A.  Awarding plaintiff compensatory, consequential and incidental damages;

B.  Awarding plaintiff punitive damages;

C.  Awarding plaintiff pre-judgment and post-judgment interest;

D.  Awarding plaintiff attorneys' fees and costs; and

E.  Awarding plaintiff such other and further relief as this Court deems equitable and just.

## COUNT III
## (CIVIL CONSPIRACY)

38.    Park West realleges and incorporates by reference the common allegations and the allegations of Counts I and II as though fully set forth herein.

39.    Defendants reached an agreement among themselves and with other as yet unknown parties identified herein as John Does 1-10 to undertake the tortious conduct alleged in this Complaint.

40.    The tortious conduct alleged in this Complaint was wrongful and tortious under

the law of the State of New York and Defendants and John Does 1-10 knowingly and willfully engaged in such conduct.

41.    Defendants and John Does 1-10 engaged in overt acts in the pursuit and furtherance of the conspiracy to commit the tortious acts alleged in this Complaint, including, but not limited to, providing financial support to Defendants with the express purpose of enabling the commission of the wrongful acts alleged herein.

42.    Plaintiff has suffered damage as a direct and proximate cause of the acts done under and pursuant to the conspiracy alleged herein.

WHEREFORE, Park West respectfully demands judgment in its favor and against defendants as follows:

A. Awarding plaintiff compensatory, consequential and incidental damages;

B. Awarding plaintiff punitive damages;

C. Awarding plaintiff pre-judgment and post-judgment interest;

D. Awarding plaintiff attorneys' fees and costs; and

E. Awarding plaintiff such other and further relief as this Court deems equitable and just.

## COUNT IV
## (PRIMA FACIE TORT)

43.    Park West realleges and incorporates by reference the common allegations and the allegations of Counts I, II and III as though fully set forth herein.

44.    Defendants intentionally, maliciously and without justification interfered with Park West's business.

45.    The tortious conduct alleged in this Complaint was wrongful and tortious under the law of the State of New York and Defendants knowingly and willfully engaged in such

conduct.

46.    As a direct and proximate result of Defendants' conduct, Park West has suffered

damages. Park West is entitled to recover such damages from Defendants.

47.    There has been no previous request for the relief requested herein.

WHEREFORE, Park West respectfully demands judgment in its favor and against

defendants as follows:

     F.  Awarding plaintiff compensatory, consequential and incidental damages;

     G.  Awarding plaintiff punitive damages;

     H.  Awarding plaintiff pre-judgment and post-judgment interest;

     I.  Awarding plaintiff attorneys' fees and costs; and

     J.  Awarding plaintiff such other and further relief as this Court deems equitable
and just.

McCUSKER, ANSELMI,
ROSEN, CARVELLI P.C.
805 Third Avenue, 12th Floor
New York, New York 10022
(212) 308-0070
*Attorneys for Plaintiff Plaintiff
Park West Galleries, Inc.*

By: _____

Michael R. Futterman

Paul J. Schwiep, Esq.
COFFEY BURLINGTON, P.L.
2699 South Bayshore Drive
Penthouse
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261
*Attorneys for Plaintiff Plaintiff
Park West Galleries, Inc.*

Dated: March 7, 2011

# EXHIBIT 1

Share   Report Abuse   Next Blog»                                    Create Blog   Si

# Fine Art Registry®: Blog

Tuesday, February 7, 2012

## Park West Gallery perversely tortures fraud victims

by Theresa Franks, for Fine Art Registry®

Short of perhaps waterboarding its victims, what else could Park West Gallery possibly do to further torture its customers who have made claims against the gallery for fraud and other abuses? Well, sue them of course, and repeatedly.



Fine Art Registry has learned that yesterday (February 6, 2012), Park West Gallery and its dastardly lawyers filed a slew of malicious lawsuits in federal and state courts, viciously (if not desperately and stupidly) attacking art fraud victims who had filed suits against the gallery for fraud. Park West Gallery is sending a message loud and clear that they are hell bent on making examples out of victims who claim art fraud, as a strong-arm warning to any others who dare challenge Park West Gallery and its art inventory.

The victims Park West Gallery is targeting with their newest series of brutal lawsuits are: Sharon Day and Julian Howard (who have been absolutely pummeled by this so-called "gallery" over the last three and a half years), Duane and Susan Raymond (we understand that Mrs. Raymond is battling cancer just like Mr. Castellano who we have reported on), Harshel Cohen, Dr. Ronald Woody, Carol Jean Ryan, and anyone else that dares file suit against Park West Gallery or its principals. This will be the second time that Sharon Day and Julian Howard have been sued by Park West Gallery—the first case was ultimately, voluntarily dismissed by Park West Gallery, because they knew they didn't have a case and when push came to shove—Park West Gallery capitulated, but not before making sure they put Day and Howard through hell. The only reason for the lawsuit was to to harass Day and Howard—to get them to shut up and back down. This newest lawsuit is just more of the same.

What is Park West Gallery's CEO, Albert Scaglione thinking? Does he really believe that bullying and harassing these victims with lawsuits will benefit his gallery's reputation? No, these lawsuits are all about vengeance, bitterness and hatred. The arrogance of Park West Gallery and its principals is astonishing. In fact, in their conduct, one is reminded of the Pharaoh in Egypt who foolishly hardened his heart and refused to let the Israelites go. We all know what happened to Pharaoh and his armies in the end after suffering many plagues. They all ended up as fish food at the bottom of the Red Sea. It is our firm belief that no matter what Park West Gallery's motivation is (which we believe is evil and perverse) in choosing to sue its own customers, they are doing wrong on so many levels, and while Park West Gallery may succeed in its abuse against these victims for a season, in the end they will not prevail. *Do not fret because of evildoers...for they shall be cut down like the grass, and wither like the green herb.* (Psalms 37, 1-2) It is only a matter of time.

We also believe that these recent lawsuits are being filed in order to try to force or pressure these and other victims into a settlement with Park West Gallery for pennies on the dollar (which evidences just how much Park West believes in the authenticity and value of its artwork). The last thing Park West Gallery wants is a trial where these victims are able to tell their respective stories to a jury. These lawsuits also serve as a warning to Park West Gallery customers: *If you even think about suing us, we will make you pay!*

Can Park West Gallery and its lawyers sink any lower? Why yes, of course. They have and they will—so let the prospective buyer beware! If you are even thinking about purchasing artwork from Park West Gallery and are presented with their invoice setting forth the Park West Gallery terms and conditions, be sure to read the document carefully.

WARNING: If Park West Gallery asks you to agree to the following terms as a condition of sale of its artwork to you, it is highly recommended that you <u>refuse</u> and <u>run</u> the other way as fast as you can



Need Help?
CHAT ONLINE »

**Fine Art Registry**

FAR BLOG
FINE ART REGISTRY®

**Search This Blog**

Search

**Follow by Email - Subscribe**

Email address...    Submit

**Michigans #1 Coin Buyer**
I have coins to sell? We buy
coins rare or not give us a call
Today
See Unlimited.tv

**Breach of Contract**
H. Joel Newman – Michigan
breach of contract litigation
lawyer...

AdChoices ▷

**Followers**

Join this site

**Members (7)**

Side b

**Blog Archive**

▼ 2012 (25)
  ▼ February (7)
    Park West Gallery perversely
    tortures fraud victim...
    The Global Art Market - An
    Overview of 2011
    California Superior Court deals
    Bernard Ewell crus...

and don't look back. The Park West Gallery terms and conditions set forth below are a red flag. Ask yourself the question: *Why would a company need such egregious and unfair terms and conditions to start with?* The answer is obvious. The Park West Gallery terms and conditions absolutely do not inure to the benefit of the buyer or consumer. The deck is stacked high against the consumer or Park West Gallery purchaser. If you agree or have agreed to these horrific terms and conditions and you as a consumer later find out what many victims like Sharon Day and Julian Howard have discovered—that the artwork they purchased is forged, defaced, and grossly overpriced, you will have little recourse:

ARBITRATION OF CLAIMS AND DISPUTES AND WAIVER OF JURY TRIAL. Any disputes or claims of any kind including but not limited to the display, promotion, auction, purchase, sale or delivery of art, items, or appraisals shall be brought solely in non-binding arbitration and not in any court or to any jury. Arbitration shall be administered by the AAA in accordance with the AAA's rules then in effect for a Commercial dispute. Florida law shall govern and be applied to all such disputes and arbitration shall take place only in Miami-Dade County, Florida. Arbitrators may but do not have to have expertise in the area(s) of the dispute. All decisions respecting the arbitrability of any dispute shall be decided by the arbitrator(s). Except as may be required by law or for confirmation of any award, neither a party nor an arbitrator may disclose the existence, content, evidence, or results of an arbitration hereunder without the prior written consent of both parties. The party initiating the arbitration shall be solely responsible for the payment of the filing fee charged by AAA. Each party shall bear its own costs and expenses, including attorneys fees, for any arbitration. *Notwithstanding the foregoing, if a party unsuccessfully contests the validity or scope of arbitration in a court of law, the non-contesting party shall be awarded reasonable attorneys' fees and expenses incurred in defending such contest.* In addition, if a party fails to abide by the terms of a settlement the other party shall be awarded reasonable attorneys' fees and expenses incurred in enforcing such settlement or award. Notwithstanding anything in foregoing to the contrary or with regard to any AAA's rules then in effect, the parties shall be required to mutually agree upon the arbitrator selected and the exclusive venue for such arbitration shall be Miami-Dade County, Florida. Following non-binding Arbitration if the claims or disputes have not been resolved, the sole remaining remedy shall be that either party may within sixty-days thereafter initial binding arbitration on the same terms, conditions, and procedures set forth above, including but not limited to confidentiality. Any judgment, award or decision rendered by the Arbitrator may be entered in and enforced by the Circuit Court in and for Miami-Dade County, Florida. Failure to proceed as set forth above shall constitute a complete and irrevocable waiver, abandonment, and release of any and all claims or disputes. [Ex. 1 (emphasis added); Ex. 2 (emphasis added).]

Excerpt from Park West Complaint filed (Feb. 6, 2012) against Sharon Day and Julian Howard

It is truly unthinkable that a company which claims it is "the largest art gallery in the world" can act with such extraordinary malice toward its own customers, especially when valid claims of fraud are made and then proven by overwhelming evidence and expert testimony. The Dali signatures on the Sharon Day and Julian Howard set of Divine Comedy are forged and Park West Gallery owns it.

Below are just a few of the more serious questions which beg answers from Park West Gallery:

- Why isn't Park West Gallery going after (or suing) the sources from which they purchased the forged Dali inventory?

- Why isn't Park West Gallery suing Bernard Ewell for his erroneous authentications of Sharon Day and Julian Howard's set of the Divine Comedy?

- Why hasn't Park West Gallery commented on or made any effort to address the Gala-Salvador Dali Foundation's findings (which findings agreed with all other recognized Dali experts—Descharnes and Hunter) to wit: that the Sharon Day and Julian Howard set of Divine Comedy is defaced- (meaning that the prints have been compromised with annotations not contemplated by Dali or the publisher at the time of distribution) and that not a single print in the set is signed by the hand of Dali?

Rather than answer the above valid questions and rather than accept responsibility for the sales of fraudulent inventory, what does Park West Gallery do? They sue their own customers. Come hell or high water—Park West Gallery is determined to make these victims pay in many more ways than one. This recent move is beyond despicable.



Salvador Dali FAKE Watercolor Alert

Semiotics: Reading Signs, Symbols, and Icons in Fi...

Fine Art Registry February Newsletter

A 'reality check' for Park West Gallery lone Dali ...

► January (19)
► 2011 (13)
► 2010 (185)
► 2009 (29)
► 2008 (32)

About Me

FineArtRegistry.com

WHAT IS FINEARTREGISTRY.COM? A web site where artists can permanently register their art when they create it and where collectors, museums and galleries can register their collections. A high tech, one-of-a-kind, patented tagging system, database and method for permanently recording works of art which helps establish authenticity and which deters and prevents art fraud and theft. A means of establishing provenance and ownership of art pieces from here on out, invaluable to artists, collectors, museums, galleries, antique dealers, and insurance companies. To works of art or any valuable collectible what the VIN (Vehicle Identification Number) system is to autos. It enables artists to permanently record their body of work and the history behind it and owners to positively and uniquely identify a piece of art and so much more. Visit us today!

View my complete profile

FineArtRegistry Facebook Fan's

Pages

Home



Posted by FineArtRegistry.com at 11:40 AM

Recommend this on Google

Labels: Albert Scaglione, egregious terms and conditions, fraud, Park West Gallery, Sharon Day and Julian Howard, sve customers

# 0 comments:

Post a Comment

### Park West Gallery Review
Read what Park West Galleries customers are saying.
www.parkwestgnl.com

AdChoices ▷

Home    Older Post

Subscribe to: Post Comments (Atom)

Copyright 2012 Global Fine Art Registry, LLC. Awesome Inc. template. Powered by Blogger.



# EXHIBIT 2

 *FINE*ARTREGISTRY™
FORUM



FAR ART FORUM INDEX   FAQ   SEARCH   MEMBERS   GROUPS   PROFILE   REGISTER   ][ FINE ART REGISTRY .COM

⌐ ⌐ Log In to check your private messages     ⇥ Log In

**You Can't Make This Stuff Up~Park West Sues Park West**

⌐ New Topic    ⌐ Post Reply    FAR Art Forum Index : Park West Gallery Art Auctions

View previous topic :: View next topic

| Author | Message |
|---|---|
| **farandaway**<br><br>Joined: 26 Aug 2007<br>Posts: 114 | ☐ Posted: Fri May 06, 2011 2:00 pm   Post subject: You Can't Make This Stuff Up~Park West Sues Park West     ⌐⌐ Quote |

Hang on...this is going to be a long one... You might want to first grab a cup of Joe or your favorite beverage.

We just couldn't resist analyzing this bit of Park West Gallery news. Note: some of the eBay listing examples referenced below, may have expired or ended by the time of this posting.

Many of our readers may recall our forum post from November 2010, where Fine Art Registry had discovered and reported that it appeared that the same exact artwork being sold by Park West Gallery onboard cruise ships and at its "VIP" auctions, was also being sold on eBay and on a website with the same name as Park West Gallery, with one almost unnoticeable difference in the name. See this link to the subject Forum Post from November 2010.

Fast forward to the present and surprise, surprise! We learned that on or about May 2nd, 2011, Park West Gallery (Albert Scaglione) formally filed a brand new lawsuit, this time attacking a dealer (who also happens to be an eBay seller) for trademark infringement under the Lanham Act. The defendants named in the newest litigation commenced by Park West Gallery are as follows: GINNIE MAC, INC., a Delaware corporation, d/b/a THE GINNIE MAC FOUNDATION d/b/a MARCEL MOULY ART GALLERY, and RICHARD KUAN.

There are some interesting and important points and observations to be made regarding this latest lawsuit filed by Park West Gallery, which are set forth below:

**Point No. 1**—Park West Gallery never plays fair (an understatement, we know). You will recall that it was just a little over a year ago, on April 21, 2010, that a jury in Michigan awarded Fine Art Registry $500,000 for Park West Gallery's willful violation and infringement of the Fine Art Registry trademarks under the Lanham Act. What goes around comes around. At first blush, it would seem Park West Gallery might have a slam dunk case against the defendant dealer. If Park West Gallery didn't wantonly go about infringing the intellectual property rights of others, like trampling on the rights of Fine Art Registry and artists Gary Benfield and Alex Perez, for example—well, maybe their complaint would appear more genuine. But Park West Gallery has no regard for anyone's rights—no matter who or what they are. BUT, hang on—there's more...

**Point No. 2**—Has Park West Gallery permitted or allowed its registered mark to be ALTERED and/or used by other art dealers? You be the judge.

Our records show that Park West Gallery allowed and/or permitted Albert Molina of Fine Art Sales, Inc., to completely alter the name of the registered mark from Park West Gallery to Fine Art Sales, Inc., and used the same logo. Uh oh! Never, ever a good thing to do. But what are a few alterations of a registered trademark among friends, right?

Below is an image of the Fine Art Sales, Inc. Certificate of Authenticity, signed by Albert Molina, who once owned Fine Art Sales, Inc., until Molina and his company were bought out by competitor Park West Gallery in approximately 1999. We posted this on the Forum way back on January 21, 2008. And another important fact—Albert Molina is now a principal of Park West Gallery. Isn't this interesting?



*Certificate of Authenticity*

[illegible faded text block]



**An image of Park West Gallery's Certificate of Authenticity appears below. Notice that the mark above is <u>exactly</u> the same (with the exception of the name) as the trademark logo that Park West Gallery claims the defendant dealer in the new lawsuit they filed is infringing? Now, doesn't that beat all?**

# PARK ☲WEST
## Certificate of Authenticity

According to the terms of the guarantee on the reverse of this certificate, we guarantee the authorship of the following work of art:

Registration No. 165412 0001
Chagall, Marc
From 'The Story of Exodus'
Then Moses stretched forth his hand toward heaven, and there was a thick darkness in all the land of Egypt.
M 492
1966
17 1/4" x 13 1/4"
lithograph in color on Arches wove paper from the edition of 250 examples (there are also 50 examples with large margin on Japon Nacre paper, hand-signed and numbered, and 15 examples annotated H·C reserved for the exhibitor, not spread).

The Story of the Exodus' suite by Chagall includes 24 single page color lithographs and two double page color...

[illegible signature and seal]

MOSES ESAKOV
SHERI SARTOR
as hand of the book

100 Crescent Drive · Suite 101 · Dover, Delaware 19901 · Phone (302) 442-0210

Park West Gallery cites in its complaint against the defendant dealer, the following:

Quote:

;The first set of claims arises out of the Defendants' Improper and unauthorized use of Plaintiff's
;registered U.S. trademark, Park West Gallery, In connection with the sale of goods In order to
:confuse consumers and Improperly and unfairly trade on the goodwill and reputation of
·Plaintiff.

Really? This has got to be a joke. How can Park West Gallery claim that this defendant dealer is confusing
customers when Park West Gallery has, as far as we know, willingly permitted Fine Art Sales, Inc. to change, alter,
and use the Park West Gallery trademark and more than once, to support the authenticity of the artwork sold by
Albert Molina and his company, Fine Art Sales, Inc. In Florida? Another important fact: Albert Molina and Albert
Scaglione used to be fierce competitors BEFORE Scaglione bought Molina and his company, lock, stock and barrel.
Hmmm?

Why didn't Park West Gallery sue Albert Molina for infringement of the Park West Gallery trademark? Couldn't it be
said that it was Albert Molina and Fine Art Sales, Inc.'s intent to "to confuse consumers and improperly and
unfairly trade on the goodwill and reputation" of Park West Gallery, especially since Fine Art Sales, Inc. was
selling the exact same product? Shouldn't Park West Gallery have sued Fine Art Sales, Inc. as well? Oh, that's
right—it's "trademark law" according to Albert Scaglione. Scaglione will allow other dealers, like Molina to alter,
change and use the Park West Gallery registered mark when it suits his empire and his profit line. That must be it.
The bottom line: based on Fine Art Sales, Inc.'s alteration and use of the mark—the Park West Gallery registered
mark could be successfully challenged in court.

The FAQs on the U.S. Trademark web site makes it pretty clear:

Quote:
Never alter a trademark - use it a single way exactly as it is trademarked...

and

Quote:
Enforce your trademark.

"Altered" is an understatement here and Park West Gallery's effort to "enforce" its trademark is at best selective
based on the art dealer wishing to alter and use it, and whether or not it is an economic benefit to Scaglione. Park
West Gallery permitted, carte blanche, its registered mark to be completely altered and then hijacked. By the way,
we checked the "live" and "dead" records at the U.S. Patent & Trademark Office and we found zero registered
marks for Fine Art Sales, Inc. A separate application for trademark should have been filed. How can Park West
Gallery's allegations against the defendant dealer be taken seriously when Park West Gallery has allowed its mark
to be bastardized and completely altered in the past by Albert Molina of Fine Art Sales, Inc.? The historical record
we have on file takes the teeth out of Park West Gallery's claims against the defendant dealer.

Park West Gallery's lawyer, Rodger Young (Young & Susser) who signed the complaint on behalf of Park West
Gallery certainly should have discovered this little bit of information as he is an avid reader of our Forum Posts.

Park West Gallery appears to have committed the cardinal sin in the failure to protect the integrity of its registered
trademark. The defendants' response or argument should maybe go something like:

Quote:
Gee, Park West Gallery you have allowed your registered mark to be altered beyond recognition. You
have also allowed and/or permitted your registered mark to be completely compromised and regularly
used by another art dealer, Albert Molina and his company, Fine Art Sales, Inc.—so why can't we use
it too?

We hope that the defendants in the case are made aware of this forum post, even though it would be much easier
and wiser for the defendants to simply change their name to something like "West Park Gallery" and steer clear of
the monster known as Park West Gallery or Fine Art Sales, Inc., or whatever their registered trademark may be on
any given day.

Point No. 3—Notwithstanding Point No. 2 above, while we "get" that Park West Gallery might take issue with the

confusingly similar name ("theparkwestgallery") used by the allegedly "offending" dealer and eBay seller which we called attention to in our Forum Post of November 2010, what I find utterly ASTONISHING is the fact that Young & Sussser—yes, the oh so brilliant Park West Gallery lawyers, neglected to allege in the 16-page complaint (exclusive of exhibits), that the defendant dealer is marketing and selling artwork on eBay under the name "theparkwestgallery" and also linking to the defendants' website "theparkwestgallery.com" from the eBay ME page.... Hmmm? Either the failure to mention that the defendant dealer is selling on eBay under the username: "theparkwestgallery" is a huge blunder by Rodger Young (which wouldn't surprise me in the least) or it is cunning and entirely calculated.

To be clear: Park West Gallery and its lawyers completely omitted any reference to the defendant marketing and selling on eBay. Indeed, one has to wonder why Rodger Young wouldn't advise his client, Scaglione, to go guns ablazing and set forth ALL of the eBay past listings and sales by the defendant (from at least the date of Park West Gallery's September cease and desist letter onward) as well as the current listings and recent sales on eBay by the dealer "theparkwestgallery" who continues to do business on eBay to this very day. See the defendant's eBay listings for yourself.

It's not as if Park West Gallery has not read our November 2010 forum post—we know they have. We know they read EVERYTHING we post that has anything remotely to do with them. So it's not as if they don't or didn't know, or weren't on notice about the active marketing and sales on eBay by the defendant dealer. Based on what we know of Albert Scaglione and Park West Gallery and its thugs, you can always count on there being calculated reasons why Albert Scaglione and his lawyers don't or didn't want to make an issue of the defendant dealer's eBay sales and marketing—again, this is assuming, of course, that Park West Gallery's lawyer, Rodger Young, wasn't negligent in failing to include these allegations against the eBay dealer known as "theparkwestgallery".

If in fact it was intentional to omit any reference to the defendant eBay dealer, is there something Park West Gallery does not want the public or the Judge to know? Well, it doesn't take a rocket scientist to figure out a few reasons why Albert Scaglione and Park West Gallery wouldn't want to call attention to the defendant eBay seller and we will explore a few of the possible reasons in Point 4, below.

The only exhibits that Scaglione and his lawyers attached to the complaint to support their allegations are a copy of the Park West Gallery trademark registration (which was registered in June 1990—which we have already commented on in Point No. 2, above), pages from the defendants' web site, and a cease and desist letter Park West Gallery wrote to the defendant, Richard Kuan:

Exhibit A Park West's trademark registration
Exhibit B Website - About Our Gallery page
Exhibit C Letter to Richard Kuan dated September 7, 2010
Exhibit D Website - Home page
Exhibit E Website - Marcel Mouly page

Apparently the defendant, Richard Kuan, ignored the Park West Gallery, September 2010 cease and desist letter, and refused to bow to the will of Albert Scaglione and his empire as he is still actively operating.

As noted—none of the exhibits or the complaint refer to eBay listings by the defendant eBay dealer: NOT A SINGLE EBAY LISTING IS ATTACHED AS AN EXHIBIT, PAST OR PRESENT. Keep in mind too that the defendant's username on eBay is: "theparkwestgallery" and eBay links to the defendant's web site "www.theparkwestgallery.com".

It would seem logical to believe that any half way intelligent lawyer filing a suit for trademark infringement on behalf of his client would see that the easy target would be the defendant's eBay offerings and sales—so why no mention of it anywhere in the complaint? Moreover, if Park West Gallery were going to try to prove damages, it certainly would stand to reason that they would go for "the low hanging fruit" here, and request an injunction against the defendants in order to stop them from marketing and selling on eBay under the name ("theparkwestgallery"), and/or claim damages from past sales on eBay, ESPECIALLY since eBay is frequented by multi-millions of users worldwide and would presumably be much more harmful than any personal web site operated by the defendants.

So if there was a claim or an allegation to be made for trademark infringement—eBay would be it. I'm just sayin. It's law school 101, unless of course, Park West Gallery has an ulterior motive. Never mind the fact that the defendant seller on eBay is marketing well and has had some success—maybe more than Park West Gallery as the defendant on eBay is selling nearly the exact same artwork inventory that Park West Gallery is selling. Oh, dear, Park West Gallery can't have that can they?—competition and all. But isn't this the same situation as what occurred with Fine Art Sales, Inc.? Maybe Albert Scaglione will have to buy out this dealer too, lock, stock and barrel, to maintain his monopolistic control. For Park West Gallery, this lawsuit is more about ridding the market of

competition than it is for any alleged trademark infringement.

**Point 4—What follows are just a few thoughts on why Park West Gallery might NOT want to make allegations in the complaint that references eBay or the defendant eBay dealer/seller:**

• Could it be that Park West Gallery didn't make any specific allegation as to eBay sales by the defendant dealer "theparkwestgallery" because Scaglione fears competition? Certainly calling attention to this defendant dealer on eBay could result in a big problem for Park West Gallery. It just might put a huge kink in the old tired, dog and pony shows known as the Park West Gallery "VIP" auctions. After all, the defendant dealer is selling basically the same inventory as Park West (just like Albert Molina and Fine Art Sales, Inc. were doing presumably with the blessing of Albert Scaglione)—Mouly, Dalí, Benfield, Renoir, Picasso, and more, but for bargain prices when compared to Park West Gallery—same inventory—lower price—and being sold much more transparently because one can go back and evaluate past sales by the defendant dealer on eBay. This is not possible with Park West Gallery as they sell in a "closed market," meaning no one but the inner circle of Park West Gallery is privy to past sales information.

Here is an example of an advertised "signed Divine Comedy" being offered by the defendant eBay dealer. It is unknown whether the print is authentically signed and we don't know the source of the inventory being offered for sale—but we do know that the price of the woodcut offered ($1,695) is much lower than what Park West Gallery has sold its so-called "signed" Dalí graphics for in the past—so even if it turns out to be a forged signature on a legitimate woodcut (like many of the Park West Gallery Dalí graphics)—the sale price is much less of risk—and one can always dispute the sale with eBay should the artwork prove inauthentic or the dealer a fraud. For example, Day and Howard, who are currently suing Park West Gallery for fraud, paid between $7,000 and $10,000 each for three forged Dalí woodcuts and on average of about $5,500 each for 100 Divine Comedy woodcuts which also turned out to be forgeries. Many of us have been told that healthy competition is good for business—but not when it comes to Park West Gallery—they don't play well with others and Scaglione would just as soon not have any competition at all—just ask Peter Max who not long ago was threatened with a lawsuit for selling his own work on a cruise ship that was not associated with Park West. It could be too that Park West Gallery omitted allegations regarding the defendant dealer's business on eBay for fear that its own customers would make price comparisons on identical inventory.

Park West Gallery certainly wouldn't want anyone to peel back the curtain to reveal that the self-proclaimed "largest art gallery on the planet" is selling the exact same commercial art product as the defendant eBay seller.

• Could it be that Park West Gallery does NOT want its customers and buyers or others (like "The Henry" in Dearborn, MI, or the Arizona Broadway Theatre and so many others, like Central Michigan University) to learn that there are boatloads (pardon the pun) of Park West Gallery artwork/inventory that has flooded the online market and/or is being offered for sale on eBay (and at many other online venues)? Like this eBay listing for example—a Divine Comedy print allegedly signed by Dalí and sold by Park West Gallery accompanied by an OUTRAGEOUSLY INFLATED Park West Gallery (2005) appraisal of a whopping $9,495.00. Incredible, especially since the woodcut appears to bear a pencil signature that looks exactly like what Dalí experts, Hunter and Descharnes declared a forgery and which world renowned questioned document and handwriting expert, William Flynn, testified at trial to be a "CRUDE FORGERY."

It appears that the same seller here also has many other pieces of Park West Gallery outrageously "appraised" artwork she is attempting to sell—with no evidence of any success under "completed eBay listings". There are many, many more examples one could list here of Park West Gallery sales offerings on eBay now and in years past, and on many, many other web sites as well. Could it be too that the reason why they didn't mention eBay was that Park West Gallery does not want its buyers to learn how they have diluted the art market with inventory they have sold (duplicates of the Divine Comedy allegedly signed by Dalí for example) at wildly disparate or incongruent prices while representing this artwork to buyers as grand investments? It might be worth someone's time to conduct a study of all the Park West Gallery sale offerings on the Internet to demonstrate the disproportionate sale prices of identical artwork to different individuals. Fine Art Registry has enough data alone after four years of complaints and investigation to conduct this study. Perhaps we will get to it one day.

• Could it be that Park West Gallery didn't make any specific allegation as to the defendant eBay dealer because Park West Gallery was supplied and did purchase spurious and forged Dalí prints from another eBay art dealer [the source of the Day/Howard forged set of Divine Comedy] named Daniel David, dba Lines et Formes, who also conveniently does business as Les Heures Claire in France—NOT to be confused with the original 1960s publisher, Les Heures Claires in Paris. Daniel David is a registered eBay user operating under the username "lesheuresclaires". It's difficult to sue a dealer who is selling on eBay when the very supplier or source of Park West Gallery's forged Dalí inventory is also doing the same on eBay under the name Les Heures Claires. What a hornet's nest of deceit.

Point No. 5—Albert Scaglione and Park West Gallery are lawsuit happy—they are litigious beyond belief. We have said it time and time again: Park West Gallery is more notorious for its aggressive and thug-like litigation tactics than they are for the spurious artwork (Dalis) they peddle and are, to our knowledge, still peddling—not to mention all the other shenanigans and underhanded tricks they pull or have pulled in the past which we have reported on for the last four years and which continue to this day as it relates to Fine Art Registry and others (which we will report on in more detail in the future).

Finally, it is important to note historically that the vast majority of Park West Gallery purchasers that have contacted us over the last four years and continue to contact us even to this day with valid questions and complaints about Park West Gallery, have communicated to us that they had never heard of Park West Gallery before they boarded a cruise ship; that they had never purchased a serious piece of artwork in their lives prior to Park West Gallery, and that they had never attended a legitimate art auction in their lives. Accordingly, after receiving well over 500 complaints from Park West Gallery buyers, it is true that Park West Gallery's quarry almost exclusively consists of the first time art buyer or the unsophisticated purchaser. It is these people—these purchasers, that are now attempting to sell their Park West Gallery purchases—many of them desperate to recover only what they paid for the artwork. Sure, when pigs fly...

The true test of the authenticity and value of Park West Gallery inventory sold to buyers comes when the buyers attempt to sell or market it. This is when the ultimate truth is revealed and the buyers learn that the promises and representations Park West Gallery salesmen made at the time of sale mean squat...and that none of the representations made to the buyer by Park West Gallery representatives can be relied upon.

We will keep our eye on this lawsuit and will report accordingly.

One thing is for certain. Park West Gallery is its own worst enemy.

_____

FarandAway

Last edited by farandawey on Sat May 07, 2011 7:17 am; edited 1 time in total

Back to top      ⛭ Profile    ⚑ P.Msg

sharonday          D Posted: Sat May 07, 2011 4:52 am   Post subject:                                             ⚏ · Quote

Joined: 27 Apr 2010     It is SOOOOO good to see you back in action Teri!
Posts: 53

Back to top      ⛭ Profile    ⚑ P.Msg

                Display posts from previous:  All Posts    Oldest First    [Go]

/ New Topic    Post Reply    FAR Art Forum Index : Park West Gallery Art Auctions          All times are GMT - 7 Hours

Page 1 of 1

                Jump to:  Park West Gallery Art Auctions        [Go]

You cannot post new topics in this forum
You cannot reply to topics in this forum
You cannot edit your posts in this forum
You cannot delete your posts in this forum
You cannot vote in polls in this forum

Protected by Anti-Spam ACP

© 2009 Global Fine Art Registry, LLC www.FineArtRegistry.com | Powered by phpBB © 2001, 2002 phpBB Group

# EXHIBIT 3



Who We Are | How We Help You | Art News & Resources | Art Search | Members |

**Articles**

- Index
- FAR Protect & Preserve
- FAR Investigative Reports
- Video Library
- Recent Art News & Articles
- Articles by Category
- FAR Columnists
- Write for FAR®

See also:

- Featured Artists
- Music, Food and Art
- Question about Art? Ask Us



Fine Art News Feed


CHAT ONLINE ›

FAR® Help Desk

Search FAR Art Gallery

Join FAR® Today! 

**Latest Art News & Articles**

- Park West Gallery's Financial Rape of the Vallilo Family
- The Marceau Trial Testimony of Benito Errel
- Visiting Shadows of Artist Post - Part 2: Lounge Payne
- Will Hooper & the Dakota-Sioux – A Forgotten Artist of the American Western Frontier
- It's Official, Spain's Casa-Salvador Dali Foundation Blasts Park West Gallery, Day Denial Comedy Skit NOT Signed by Dali
- Round 2 – Defendants Park West Gallery and Royal Caribbean to Face Victims and FAR® in Nov. 2011 Jury Trial
- The Art Nouveau and Art Deco Periods in France
- The Virgin of Passion and Guanyin: A Comparison of Fine Art Female Deities
- An Artist's Prejudice: The Accidental Portrait of a Strong-Minded Woman
- The Ancient Art and Craft of Glove-Making
- Antique Auction Forum Interviews Ted Franks

➤ View all Articles

Park Library › Legal  Park West Gallery Lawsuits › Park West Gallery's Financial Rape of the Vallilo Family

## Park West Gallery's Financial Rape of the Vallilio Family:

### The Passionate and Emotional Trial Testimony of Mike Vallilio

by Fine Art Registry®

Share |

Q. *Sir, in your opinion, do you believe that Park West is engaged in unethical conduct?*
—Jonathan Schwartz, FAR® Attorney, April 12, 2010, p. 49, lines 21-23

A. *Unethical, criminal activity. Like I said before, I think they are worse than the Mafia. Only difference, the Mafia is being put in jail everyday and they haven't been.*
—Mike Vallilio, April 12, 2010, p. 49, lines 22-25



The Vallilio Family - Read the *Case Study*

It's hard to believe that it has been more than two years since we first published the *story of Mike Vallilio*, his wife Mana, and his family, who sailed aboard Royal Caribbean cruise ("RCCL") ships and who had the unfortunate experience of being ensnared by RCCL's revenue partner, *Park West Gallery*.

When the Vallilios sailed on RCCL, they had no warning that they were going to be fleeced. At the time the Vallilios story was published on Fine Art Registry in 2009, we knew that at least a few of the RCCL executives had constructive notice of Park West Gallery's deceptive and unfair trade practices and that Park West Gallery was also selling fraudulent and/or forged Dalí graphics aboard its ships and at land auctions. Because RCCL shared generously in the Park West Gallery sales made aboard its ships (over a period of more than a decade), RCCL was not in any way inclined to kill the art peddling vulture that had become one of RCCL's top revenue generators (aka concessionaires), that helped to line the pockets of RCCL cruise executives and also increased their shareholders' bottom line, but at the terrible expense of its own customers.

Despite the numerous reports (beginning in August of 2007) on Fine Art Registry® of the ongoing fraud and RCCL's knowledge of same, RCCL did absolutely nothing to stop it. That is, until *Fine Art Registry won a unanimous jury verdict against Park West Gallery on April 23, 2010*. It was soon after the jury verdict and after this writer received a death threat from the corporate offices of PCCL in Florida, that PCCL decided not to renew its contract with Park West Gallery. The multi-million dollar question is: why didn't RCCL terminate Park West Gallery in 2008 or earlier when they learned from Fine Art Registry how Park West Gallery was bilking RCCL's passengers? Well, there are probably a whole host of reasons, all of them calculated to save the necks of PCCL and Park West Gallery. A few possibilities that come to mind are:

- RCCL banked on Park West Gallery silencing Fine Art Registry
- Pure greed—the good old "profits before people" mentality
- RCCL feared that if they terminated Park West Gallery (they would necessarily have to disclose reasons why or the cause for the termination which would be fraud and deceptive and unfair trade practices) it would open up the flood gates to hundreds of thousands of fraud claims from the passengers that had purchased from Park West Gallery aboard its ships for more than a decade. This would be far too costly for PCCL, but it would have saved countless victims and their own customers from the Park West Gallery burn if they had only terminated the contract three years or more ago.

FAR Newsletter Sign-Up

Email

[Join]



Art For Sale



Beached
by: Paul Gallardo









so many beads ..

D beadream.com

So, in our opinion, RCCL's strategy was to let the Park West Gallery contract run its course and if things went Park West Gallery's way in its (SLAPP) defamation suit against Fine Art Registry, well, RCCL and Park West Gallery could go on doing business as usual and the warm and fuzzy, financially rewarding relationship would continue. And if things didn't go Park West Gallery's way at trial -- RCCL would just choose not to renew its contract with Park West Gallery. This way RCCL would be off the hook (or so they thought) and they wouldn't have to give a reason for its decision not to renew and at the same time continue to collect huge sums of money from Park West Gallery sales until the contract ran out. Yes, it was a win-win strategy for PCCL, but there was just one problem. Park West Gallery didn't win its defamation case against Fine Art Registry -- not by a long shot. Not only did Park West Gallery lose miserably at trial -- the jury awarded Fine Art Registry a half-million dollars to boot. The death threat made to this writer from RCCL offices didn't help them much either. And the hits keep on coming. Recently, the Gala-Salvador Dali Foundation in Spain weighed in on the legitimacy (or we should say the illegitimacy) of the Dali artwork that was sold by Park West Gallery to Day and Howard and from which RCCL benefited financially. The evidence against RCCL and Park West Gallery is certainly damning and the evidence against them doesn't stop with this. Fine Art Registry has much more that will be revealed soon and it won't be pretty.

Mike and Maria Vallillo's jury trial is currently scheduled for November, 2011. They will finally have their day in court for the $100,000, in fraudulent Park West Gallery purchases, and we are confident that a jury will find in their favor and that they will be recompensed for the horrific experience they have had to endure for the last several years at the hands of Park West Gallery and its partner RCCL. It is also important to note here that Park West Gallery sued Mike and Maria Vallillo (its own customers) for a whopping $46 MILLION dollars for speaking the truth about Park West Gallery's deceptive and unfair trade practices. Park West Gallery was later forced to dismiss the $46 million dollar suit against the Vallillos. The Vallillos were put through hell and they were required to make a claim with their homeowner's insurance carrier in order that they could be provided with defense counsel to fight Park West Gallery's bogus claim. Park West Gallery and its CEO Albert Scaglione didn't stop with the Vallillos either. They also sued Day and Howard for $46 million dollars as well as Dan Austin and Martha Szostak. What kind of a company sues its own customers for claiming fraud and deceptive and unfair trade practices? Though Park West Gallery has dismissed its claims against Day/Howard and Debi Austin, its lawsuit against Martha Szostak is still ongoing. We will bring you Ms. Szostak's trial testimony in a future article. We believe you will find her testimony extremely compelling.

Park West Gallery and its legal thugs would have the world believe that the Federal trial in Michigan last year was not about the authenticity of its Dali inventory. This couldn't be farther from the truth which is clearly evidenced by the Vallillo sworn testimony below. We will be offering additional trial testimony from victims Sharon Day, Martha Szostak, Richard English, and others, in future articles here on Fine Art Registry that will demonstrate beyond a doubt that the trial Fine Art Registry won in Michigan last year was very much about the bogus Dali inventory that Park West Gallery sells and has sold for more than a decade.

To give our readers an idea of the testimony that Park West Gallery and Royal Caribbean will be confronted with at trial in November of this year, what follows is a large portion of Mike Vallillo's emotional and compelling sworn testimony from the Fine Art Registry trial of March-April, 2010. The testimony of Mike Vallillo is certainly an instructive warning for all those who sail aboard ships that still host the art peddler, Park West Gallery, and for those that are invited to any of the Park West Gallery VIP events on land or at sea. It is also important to note that there are other vendors, like Park West Gallery, that practice the same dog and pony shows aboard cruise ships and on land, so let the buyer beware.

Note: The trial transcript published here is copied exactly as it was taken down by the court reporter. There is no attempt to correct spelling, grammar, or sentence structure. Comments by this writer (who was present for the entire trial) are noted in brackets [ ] and are her opinion based on documentary evidence and interviews with hundreds of victims and professionals in the industry. Throughout this questioning and the testimony, Rodger Young, the attorney for Park West Gallery, was popping up and down, in and out of his chair like a jack-in-the-box, objecting to our lawyer's line of questioning as well as the witness's testimony. While we have omitted most of Rodger Young's ridiculous "hearsay" objections, we did include some of the objections as is; in order to give the reader an idea of Park West Gallery's frantic desperation to keep the truth from the jury.

### Mike Vallillo Sworn Trial Testimony

Mike Vallillo is under direct examination by Fine Art Registry attorney, Jonathan Schwartz. It is the morning of April 12, 2010:

DIRECT EXAMINATION

BY MR. SCHWARTZ:

Q. Good morning, sir. Can you please state your name for the record?

A. Michael Vallillo.

Q. Is it okay if I call you Mike?

A. Sure.

Q. Mike, how old are you?

A. 52.

Q. And what city and state do you live in?

A. New Jersey, Parsimony, New Jersey.

Q. Are you married?

A. Yes, I am.

Q. What is your wife's name?

A. Maria.


Q. Do you have any children?

A. Four boys.


Q. What are their names?

A. Phillip, Michael, Joseph and Nicholas.


Q. In the year 2003 did you take a cruise?

A. Yes, I did.


Q. What cruise line did you take a cruise on?

A. Royal Carribean.


Q. On that 2003 cruise, were there art auctions being held on the cruise ship?

A. Yes, there were.


Q. Were there any kind of announcements for the passengers telling them there was going to be an art auction?

A. They do announcements. They hand out fliers. They put fliers under your door telling you what the daily activities are.


Q. Are art auctions one of the daily activities that the cruise ships advertise?

A. Usually ever other day, something like that they have an art auction.


Q. On that 2003 ship do you know which company was holding the art auctions?

A. Park West Gallery.


Q. That is Park West, the plaintiff in this case?

A. Yes.


Q. On that 2003 cruise, did you attend any art auctions being held by Park West?

A. Yes, I did.


Q. Did you attend one art auction or numerous?

A. Numerous art auctions.


Q. Can you describe for me the atmosphere at that 2003 cruise art auction or the art auctions?

A. You have a room about this size, maybe twice this size full of art work. You have representatives from Park West Galleries, both men and women, sales people, auctioneers, whatever you want to call them, showing you the art work, explaining to you the art work. They serve hors dhoevres. They serve Champagne and drinks and what not.


Q. Were you alone for those auctions or did you - any familiar members attend with you?

A. Most of the time alone. Every once in a while of my kids would pop in or my wife would pop in.


Q. Did you speak to any of the auctioneers on the 2003 cruise?

A. Yes, I did.

Q. Okay. Were they wearing a name tag or anything to identify who they were?

A. Yes, they were wearing name Park West Gallery name tags. I don't remember in particular who I spoke to back then, but, yes.

*[Interestingly, at trial, Rodger Young, the lawyer for Park West Gallery told the Judge that the auctioneer's were NOT Park West Gallery employees--that they were employed by Plymouth Auctioneering which is a sham corporation set up by Albert Scaglione off shore in the Turks & Calcos. Yet, the Park West Gallery auctioneers wore name tags bearing the name of "Park West Gallery". When it suited them, Park West Gallery representatives lied through their teeth at trial.]*

Q. Do you recall if you spoke to one auctioneer or more than one auctioneer?

A. More than one. Most the time usually a guy and a girl. The guy or a girl.

Q. So it's fair to say that sometimes more than one auctioneer was talking to you?

A. Yes.

Q. Did you purchase any art work on the 2003 cruise?

A. Yes, I did.

Q. Okay. Do you recall what exactly you purchased?

A. I purchased a Goya, a Dürer and a Rembrandt.

Q. Do you recall approximately how much you paid for the art work?

A. About 18,000.

Q. Did you buy this art work on the 2003 cruise as an investment?

A. Strictly investment.

Q. Did you believe at the time of the purchase that the art work was a good investment?

A. According to the auctioneers I was told it was a good investment.

Q. Did you or anyone in your family ever attempt to get on the internet on the 2003 cruise before you purchased the art work?

A. My oldest son, Phillip, did.

Q. Did he have any luck doing that?

A. No, it was virtually impossible.

Q. Can you tell me what you mean by that?

A. Out at sea and takes time to get an internet line, first of all. And second of all, he was coming back and forth with me. He needed a credit card because to get on the internet line was $30 or $40 and then it was just like an impossible thing to try get on the internet and figure out what you were looking at, what you were buying.

*[Days before Valililo's testimony, this writer testified on the stand when questioned by Park West Gallery lawyer, Rodger Young, that it was impossible for Park West Gallery purchasers to perform proper due diligence regarding Park West Gallery art onboard ship. Further, performing due diligence was not encouraged by Park West Gallery for obvious reasons. We also had good reason to believe that the search results onboard ship were filtered to exclude any references or search results relating to negative commentary and lawsuits filed against Park West Gallery for fraud. The testimony of Mike Valililo confirmed my testimony.]*

Q. Did the reputation of the cruise line factor into your decision to purchase the art work from Park West?

A. Yes.

*[In all of the hundreds and hundreds of complaints that Fine Art Registry has received concerning Park West Gallery over the last four years, the complainants have stated that they all relied (to their detriment) on the cruise line brand's reputation in making their Park West Gallery purchases. The cruise line brand lends credibility to Park West Gallery and other concessionaires onboard. This is deceptive because the cruise lines will do nothing to endorse Park West Gallery or to assist with claims, even though the cruise lines rake in the profits from Park West Gallery.]*

Q. Can you explain that?

A. Well, Royal Caribbean has been around for a lot of years. They are a reputable cruise line. And I would only tend to believe that they would have nothing more than reputable vendors on their cruise ships.

Q. Okay. Before you purchased art work on the 2003 cruise did you have some kind of understanding of the Park West return policy or whether they would accept art work back from you?

A. It was my understanding they would buy back the art work at any given time.

*[Park West Gallery salesman made these false and misleading representations over and over and over again in order to make the sale. The bottom line: You can't rely on a word that comes out of the mouth of Park West Gallery salesmen and especially the fork-tongued lead salesman, Morris Shapiro--Just ask Sharon Day and Julian Howard.]*

Q. Did you take this art work off the ship with you or was it shipped to you?

A. No, it was shipped to me.

Q. Did Park West send you documentation related to that art work?

A. I always got the documentation after the fact.

*[This is all part of the scam. If they gave the buyer the artwork onboard ship BEFORE arriving home, there would be time to check things out and to compare with other buyers. No, Park West Gallery does not want its buyers to have this information in advance of receiving the artwork, six to ten weeks post cruise. For example, if buyers were to have the Certificate of Authenticity and the Appraisal on the ship, buyer "A" who purchased a forged Dali print on day one of the cruise for $10,000 could then compare his purchase with buyer "B" who just so happened to purchase the exact same forged Dali print on day seven of the cruise for $3,000, much, much less than buyer "A". It is important to realize that the Park West Gallery salesman only have a very small window of time to make as much money as possible for Park West Gallery and the cruise line on a any given cruise.]*

Q. What types of documentation did you receive?

A. I received appraisals and Certificates of Authenticity.

Q. Do you recall if the appraisal price was higher or lower than the price you paid for the art work?

A. The first appraisal that I received was higher. Then there was a time when I was looking to sell the art work that I contacted Park West. I received additional appraisals that were even higher.

*[This writer addressed the Lonus Perl, West Gallery appraisals in an article on FAR®. We have not found one instance where Park West Gallery has appraised the artwork for less than what they sold it for. Take the Dalí/Howard Divine Comedy set, for example. They purchased the set for around $450,000 and the appraisal (signed by Scaglione) was for $510,000. This is deception at its height. It leads the buyer to believe that they there is instant equity in the purchase when in truth, the artwork could not be flipped for even a fraction of what the buyer paid for it. The Dalí/Howard Divine Comedy set is completely worthless, because the prints are [fraudulently signed and are defaced.]*

Q. Okay. In the year 2004 did you take a cruise?

A. Yes, I did.

Q. What cruise line was that?

A. Royal Caribbean also.

Q. Were there art auctions being held on that cruise ship?

A. Yes, there were.

Q. Do you know which auction company was selling the art work?

A. Park West Galleries.

Q. How did you know that this was a Park West auction?

A. Again, they made the announcement. They handed out flyers and what not. Left the noticed under your door. I believe I even got a couple of messages in my room being that I was a previous purchaser of art work from Park West. They contacted me to let me know there was another art auction going on.

*[Once they get their hooks in you...they won't let you go. They will hit you over and over and over again. Without the cruise lines, Park West would have few customers.]*

Q. ' Were there any signs around the auction indicating who the auction company was?

A. Yes.

Q. Okay. Can you tell me what you saw/?

A. Park West Galleries.

Q. Did you ever, on this second cruise, were there name tags on the auctioneers again?

A. Yes.

Q. Did you ever receive a business card from a auctioneer?

A. Yes, I have.

Q. Did that business card indicate who the auctioneers worked for?

A. Yes. Auctioneer was Mr. Ferguson and he showed that he worked for Park West Galleries.

Q. Okay. At the 2004 cruise auctions was there Champagne being served?

A. Yes, there was.

Q. Do you recall if you went to -- on that -- well, let's take any cruise that you went on, have you ever heard of the name Plymouth Auctioneering?

A. No, not familiar with it.

Q. Okay. On 2004 cruise did you attend one auction or more than one auction?

A. Multiple auctions.

Q. Did you speak to any of the art auctioneers on the 2004 cruise?

A. Yes, I did.

Q. Did you buy any art work on the 2004 cruise?

A. Yes, I did.

Q. Do you recall what you purchased?

A. Again, I bought a couple of Rembrandts. And then I bought some animated art for my children. And I bought a Dali, Salvador Dali, St. George And The Dragon.

MR. SCHWARTZ: May I approach the witness, your Honor?

THE COURT: Yes, you may.

BY MR. SCHWARTZ:

Q. Mr. Vallillo, I'm showing you a demonstrative exhibit which Mr. Frank Hunter and Mr. Nicholas Descharnes have already referred to. This is the St. George And The Dragon print. Is this what you purchased on that cruise?

A. Yes, it is.

Q. Okay.

THE COURT: Are you saying that that is the print that this gentleman purchased?

MR. SCHWARTZ: Yes. That's what he testified to, correct.

THE COURT: Okay.


BY MR. SCHWARTZ:


Q. Do you recall how much you spent in total on the 2004 cruise?

A. Approximately 25,000.


Q. As to the Saint George And The Dragon purported Dali print with a purported Dali signature, do you recall how much you paid for that?

A. Eighteen thousand five hundred.

*[AN OUTRAGEOUS SUM FOR A FAKE PRINT WITH A FORGED SIGNATURE!]*


Q. Okay. Did you take this art work off the ship or was it mailed to you?

A. No, it was mailed to me.


Q. Again, did you receive similar documentation that you received for the other art work that you purchased from Park West including Certificates of Authenticity and invoices?

A. Yes, I did. I received it in the U.S. mail.


Q. At the time you were purchasing the St. George And The Dragon and the other art work on the 2004 cruise did you believe that the art work was a good investment?

A. Yes, I did.


Q. Okay. At the time did you believe the St. George And The Dragon print was authentic?

A. That's what I was told, that it was authentic.


Q. In the year 2005 did you ever attend a Park West Gallery VIP event on land?

*[BEWARE! BEWARE! BEWARE! of the Park West Gallery VIP events. Think about Vegas. The house always wins. There are no free lunches in this world.]*

A. Yes, I did.


Q. Okay. Where was that?

A. In Wippenny, New Jersey, the Hilton Hotel or it might be Parsimony. It's right there on the border.


Q. How did you learn about this VIP auction?

A. I was sent an invitation.

*[Isn't it interesting that none of the Park West Gallery VIP events are advertised publicly? How does Park West Gallery know about Mr. Vallillo in order to send him an invitation? From the cruise line he sailed on, of course, Royal Caribbean. RCCL is supposed to earn a portion of any past cruise sales. What a racket.]*

Q. Who sent you the invitation?

A. Park West Galleries.


Q. Okay. Did you go by yourself or with anyone else?

A. No, I went with my son.


Q. Okay. Which son?

A. Phillip, my oldest son.

Q. Were there drinks being served at this event like at the other two cruises you previously attended?

A. Drinks and dinner before the auction and then we went into the auction part.

Q. Did you purchase any art work at this auction?

A. Yes, I did.

Q. Do you recall what you purchased?

A. I purchased two Rembrandts and a Salvador Dali.

MR. SCHWARTZ: Your Honor, may I approach the witness?

THE COURT: Yes, you may.

BY MR. SCHWARTZ:

Q. Mr. Valdilio, I'm showing you an unsigned Dali print. Is that what you purchased at the auction on land?

A. Yes, it is.

Q. Do you recall how much you spent on art work at that land auction?

A. Approximately 4500.

Q. Can you tell me how much you spent on an unsigned Dali print that you purchased at this auction?

A. $1,050.

Q. Did you receive documentation from Park West for this art work?

A. Yes, I did.

Q. At the time you purchased this art work did you believe it was a good investment?

A. Yes, I did.

Q. In the year 2006 did you take a cruise?

A. Yes.

Q. What cruise company?

A. Royal Caribbean.

Q. Were there auctions being held on that cruise ship?

A. Yes, they were.

Q. What company was selling the art work?

A. Same, Park West Galleries.

Q. Did you attend any art auctions on that 2006 cruise?

A. Yes, I did.

Q. Did you attend one or more than one?

A. More than one.

Q. Okay. Were these different than the other at sea auctions you attended or were they basically the same?

A. Basically the same.

Q. Did you purchase art work from Park West?

A. Yes, I did.

Q. What did you buy?

A. I bought -- I completed the Rembrandt Millenium Collection. It was probably four Rembrandts that I bought. I bought some -- two Salvador Dalis and I bought some animation art for my kids.

*[Park West Gallery lied to its customers for years about its so-called "Rembrandt Millennium Collection," making up all sorts of wild tales, but in essence telling their customers that the etchings were oh so rare and that the etching plates were owned by someone other than Park West Gallery. When we broke our investigative story on the Park West Gallery Rembrandt Collection -- well, let's just say that Park West Gallery was BUSTED. It was then that they started making up more stories to cover their initial lies. Morris Shapiro continued to lie on the stand at trial about the Rembrandt plates. Why not just tell the truth, Park West Gallery? They bought the etching plates for $7 million dollars so they could "steel-face" the copper plates for longevity in order to continue printing countless numbers to sell on cruise ships.]*

Q. Do you recall how much in total you spent on art work from Park West at this 2006 auction?

A. About $53,000.

Q. At this, on this cruise you purchased two signed Dali prints, correct?

A. Yes.

Q. What did you pay for each of them?

A. I paid $5300 each and that was predetermined before the auction.

*[These so-called "pre-determined" sales prices are where Park West Gallery auctioneers/salesmen really stick it to the buyer. They get the buyer to agree to a set price before auction so they can use the buyer as a shill and so they can increase interest at the dog and pony show sale event (making it look like there are bona fide bids, when there aren't) which is really not an auction at all and for other reasons that are far too complicated to set forth here in this article, but we have reported on this slick Park West Gallery maneuver in past articles.]*

Q. What do you mean by that?

A. One of the auctioneers basically said I should start collecting on the Divine Comedy.

Q. If you can answer the question without telling me exactly what the auctioneer said to you, then I will take an answer. But you are not allowed to say what the auctioneer told you because there is a dispute.

*[Rodger Young was going nuts with hearsay objections and interrupted the flow of questioning because he didn't want the jury to hear what Vallilla had to say.]*

A. I said I was under the impression of.

BY MR. SCHWARTZ:

Q. Did you receive paperwork from Park West about that art work on the 2006 cruise?

A. Yes, I did.

Q. Okay. Did this include Certificates of Authenticity and appraisals?

A. Yes.

Q. Was the appraisal price you were given from Park West more than the purchase price of the art work?

A. Yes, it was.

Q. Did you believe at the time you were purchasing the art work it was a good investment?

A. Yes, I did.

*[Everyone that has ever contacted us with a complaint about Park West Gallery has told us that they were sold works of art "an investment". Nearly 100% of the people who buy from Park West Gallery have never heard of Park West Gallery until they board a cruise ship, have never purchased a serious artwork in their lives, and have never attended a legitimate art auction in their lives. Park West Gallery preys on the first-time art buyer and always leads the buyer to believe (using the Park West bogus appraisal that the salesmen will show prospective buyers on their laptop computers) that the artwork is ultra rare and/or is very limited.]*

Q. Now, I want to ask you some general questions about your purchase of art work on these three cruises and the one land auction from Park West?

A. Sure.

Q. Okay. Approximately how much did you spend on all the art work you purchased from Park West?

A. Just a little over a hundred thousand dollars.

*[Because the Dali artwork is fake and forged -- it is worthless. The Rembrandts that Vallitia purchased are contemporary etchings allegedly made from the plates owned by Park West Gallery. In other words, they have decorative value only. They are not rare or printed in Rembrandt's lifetime. We also can't be certain if the Rembrandt prints are actually "etchings" made from the steel-faced plates unless the print is removed from the Park West frame and examined by an expert. We have found cases where Park West Gallery Rembrandt prints are nothing more than photomechanical reproductions.]*

Q. Is that a lot of money to you?

A. It's absolutely a lot of money to me. It was my children's college funds.

*[You can't imagine how many times we have heard horror stories from Park West Gallery purchasers who were promised by Park West Gallery salesman/auctioneers that they would be able to turn their artwork for a huge profit because they (the buyers) were purchasing it for 60% to 80% less than land gallery prices -- when in fact it wasn't true. This kind of practice is morally corrupt, disgusting and abhorrent.]*

Q. Okay. Did you pay any extra money on top of that to have the art work stored anywhere?

A. Yes. I kept it in a climate controlled storage facility from the time I purchased it until I was ready to sell it.

*[Sharon Day and Julian Howard did the same and insured it too. Insurance companies have no idea what they are underwriting when they agree to insure Park West Gallery art. The Park West Gallery appraisals that the insurance companies rely on to represent "fair market value" or "replacement value" are bogus. For example, if the Day/Howard set of Divine Comedy was stolen -- their insurance carrier would have had to pay out a claim based on the Park West Gallery bogus appraisal of $510,000, when in fact the set is absolutely worthless. And if even it had been a legitimate set of Divine Comedy in "pristine condition" and legitimately signed by Dali as represented by Park West Gallery salesman, Morris Shapiro, it would have been GROSSLY overpriced. Consider that a complete set of Divine Comedy signed by Dali and authenticated by Frank Hunter and Nicolas Descharnes just sold at Bonham's for about $110,000 -- 75% less than what Day and Howard paid for their fraudulent set.]*

Q. Do you recall -- strike that. For all the art work you purchased from Park West, did you receive a Park West appraisal?

A. I received two Park West appraisals.

Q. Okay. Taking the first Park West appraisal, do you recall in total what Park West appraised the value of your art work to be?

A. Just under a $142,000.

Q. And then you had said you received the second appraisal from Park West?

A. At the time I was ready to sell the art work which was when my son was going to college I requested a second appraisal so I knew what I could get for the art work and that came in at just under $185,000.

*[What a sham! This is how they keep the hook in. Make the buyer believe he is building equity in the artwork by providing updated appraisals when in fact they aren't legitimate appraisals at all. The so-called Park West Gallery appraisals are signed by Albert Scaglione, the owner of Park West Gallery, who has every interest in making sure the purchasers keep on believing. What's more, Scaglione is making a fortune off what he charges for his bogus appraisals which are no different than the Park West Gallery Certificates of Authenticity that they give free of charge. How does this reconcile? Yes, it's just a sleight of hand -- the ultimate shell game. Deception at its finest.]*

Q. When you saw that did you believe you had made a pretty good investment?

A. I was ecstatic.

Q. Did you ever take out a Park West credit card?

A. Yes, I did. My wife did.

Q. Is it true that when you used the Park West credit card to purchase art work you have to pay off the whole credit card before you get any of the art work?

A. That's correct.

Q. Now as to what you observed about, from the art work -- strike that. Can you tell me from what you observed, can you tell me about the sales tactics of the Park West sales people?

A. Sales tactics -

BY MR. SCHWARTZ:

Q. Can you tell me, Mr. Vallillo, when you received the second set of appraisals?

A. It was somewhere around 2006.

Q. Okay. And getting back to the auctioneers, you testified that the sales were prearranged before the auction, is that correct?

A. That's correct.

Q. Okay. Did you know what art work you were going to purchase before the auction?

A. Yes. Two Salvador Dali prints.

Q. Okay. And I'm just talking in general here. Did the auctioneer know what art work you were going to buy?

A. He basically walked around with me and asked me which pieces I was interested in which I pointed out and they got these legal red tags and yellow tags and green tags they put on the art work.

Q. Okay. Did you and the auctioneer have a price arranged before the auction?

A. Yes, we had a prearranged price.

Q. Okay. So did you believe the sale was essentially completed prior to the auction?

A. Absolutely it was completed prior to the auction. I already knew what I was paying for the art work before the auction ended, before the auction even started. We had a pre-agreed price on what I was going buy the two Dali prints for.

Q. Did Park West still have you go through --

A. Still went through the motions, yes. We went still went through the motions of the auction.

*[Yup...this is all part of the Park West Gallery game. And they had the nerve to charge Vallillo a buyer's premium on top of it all -- even though it was a pre-arranged purchase and even though Park West Gallery owns all the artwork. Buyer's premiums are usually reserved for auction houses that have consigned works of art. This is how legitimate auction houses make their money. For Park West Gallery it's just another surcharge -- just like the charge for their bogus appraisals.]*

Q. Do you know why that was done?

A. I have no idea.

Q. Okay. Even though you had bought this art work prior to the actual auction, were you charged a buyer's premium?

A. Yes, $1,083 each.

Q. Okay. And are you talking about specific prints there?

A. That's on the two Dali prints.

Q. At that VIP auction on land which wasn't at sea did you have a belief as to who the auctioneers were at those events?

A. No. I don't remember their names. I mean, I know they were Park West Gallery auctioneers but I can't remember their names if that is what you are asking me.

Q. Were there Park West Gallery signs at that VIP auction as well?

A. Yes.

Q. Now at some point after purchasing the art work from Park West you said you asked for updated appraisals, correct?

A. Correct.

Q. Okay. And the value indicated was greater than the initial appraisals Park West had given you?

A. Yea. It went up to $185,000 from $141,000.

Q. And you testified at some point you wanted to purchase the art work, correct?

A. Sorry?

Q. At some point you wanted to sell art work, correct.

A. Correct.

Q. Around what time was that?

A. It was around summer of 2008. My son was getting ready to go to college and I had to pay for his first semester.

Q. So was your specific reason for wanting to sell the art work to pay for your son's college?

A. That was my specific reason for buying the art work as an investment to make money with it to put my two younger children through college, being that it was their monies that I used to purchase the art work.

Q. Okay. And at this point before you actually sold that. were the Park West appraisals the only documents you had indicating the value of the art work?

A. That's it.

Q. Okay. Did you rely on these appraisals for your belief as to how much the art work could be sold for?

A. Yes, I did. Absolutely.

*[Everyone relies to their detriment on the Park West Gallery bogus appraisals. Without the appraisals they wouldn't sell any artwork. They need these worthless pieces of paper to prop up their art. BUT, the rubber meets the road when it's time for the Park West Gallery buyer to turn around and sell it on the secondary market. This is when reality BITES.]*

Q. At any time did you contact Park West to sell your art work?

A. Yes, they were the first people I contacted to sell the art work.

Q. Can you tell me why you called Park West, the seller of the art work to possibly repurchase the art work?

A. I was under the impression that Park West would buy the art work back at any time.

*[Park West Gallery salesmen/auctioneers will lie through their teeth to make a sale -- their sales people are trained by Park West Gallery representatives like Morris Shapiro. And all Park West Gallery invoices state that the buyer can't rely on anything their auctioneers or salesmen say -- no representations of any kind, Park West Gallery admits in writing that anything their auctioneers say cannot be relied on. Their sales people all work on commission and are limited to a very small window of time in which to make that nut for Park West Gallery and the cruise lines. The pressure is immense on the buyer and the sales agent for Park West.]*

Q. Do you recall if you called the Park West Customer Service Department or do you know specifically who you spoke to?

A. Customer Service Department and I spoke to a Ms. Laura Mackey.

*[A real sweetheart, along with the rest of the Rottweilers at the Park West Gallery customer service gate.]*

Q. Okay. And I don't think we are going to get any argument on this but did you believe Laura Mackey was an employee of Park West?

A. Yes, I did.

Q. Okay. When you spoke to Mrs. Mackey did you offer to sell your art work back to Park West?

A. Yes.

Q. Did Park West agree to purchase back the art work?

A. Not directly, no.

Q. Did they agree to purchase any part of your art work back?

A. No. They basically put me in touch with another outlet that they work with to purchase their art work back.

Q. And do you recall the name of this other person that Park West referred you to?

A. It was Caroline Ashley Associates, auctionyourart.com.

*[Well, what do you know! There's that name again. Ashleigh just keeps popping up all over the Park West Gallery landscape and elsewhere too. She has been sued by a number of her clients in the past. Here, Caroline Ashleigh was being forwarded as the "resale" division of Park West Gallery. We have copies of lots of email from Park West Gallery customer service reps to victims telling them they should sell their artwork and have it appraised through Caroline Ashleigh.]*

Q. And did Ms. Mackey tell you that like Mr. Ewoll, Park West does a lot of work with Ms. Ashley?

Q. Did Park West tell you that Ms. Ashley had done lots of work for them?

A. That's what Laura Mackey told me, yes.

Q. Did you ever contact Ms. Ashley's office?

A. Yes, I did.

Q. Did you tell her about the -- did you tell Ms. Ashley that you wanted to sell the art work and what you wanted to sell?

A. Never spoke to Ms. Ashley direct but I spoke to one of her associates.

Q. Did you speak to this associate about the value of the art work?

A. Yes, I explained to her everything that I owned. I sent them fax copies of the appraisals and what not. And, you know, went through the whole motions.

Q. Were you satisfied with the price that you would be able to sell the art work for through Ms. Ashley?

A. No, not at all.

Q. Why is that?

A. By the time we got done with everything and she explained to me the difference between -

*[There goes that pesky Rodger Young again, interrupting the answer, because he didn't want the jury to know the truth about the relationship between Park West Gallery and Caroline Ashleigh.]*

Q. Well, without telling me what you were told, were you satisfied with what you believed to be the price you could sell the art work for?

A. No. At the end of the day I would have wound up with maybe 10 percent of what I paid for it.

Q. After you had spoken to Park West and Park West had referred you to Ms. Ashley and you had spoken to Ms. Ashley, did you ever attempt to find a different purchaser, potential purchaser for your Park West art work?

A. I contacted about fifteen, twenty different art galleries around the country.

*[We have never heard from a single person who purchased artwork from Park West Gallery that sold their artwork for a profit, much less for what they paid for it. This is the stark reality. Sadly, the Park West buyers don't learn what a big mistake they made, until they go to try to sell the artwork they purchased.]*

Q. How did you find these different fifteen to twenty art galleries?

A. Mostly through the Internet.

Q. Okay. Were you able to sell the Park West pieces to the art dealers that you contacted?

A. Absolutely not.

*[What a surprise. No one wanted to touch the Park West Gallery artwork. Hmmm?]*

Q. Would anyone even touch the art work that Park West sold you?

Q. Did you tell these fifteen to twenty art dealers about the art work you purchased from Park West?

A. Every time I contacted an art dealer I told them the Rembrandts, that I had so many Rembrandts, the Millenium Collection for sale, a lot of these art companies or dealers showed interest. Once they started questioning me about the provenance of where I got it, they refused to even talk to me about it.

*[It would seem that Park West Gallery artwork is radioactive.]*

Q. So again you were unable to sell any of your art work to these fifteen to twenty art companies across the country?

A. Nobody was interested.

*[Certainly, if Park West Gallery believed in the value of their own artwork and the values of their appraisals, they would eat their own "dog food" and buy the artwork back at the purchase price and then make a few bucks on the deal. Nah, not a chance -- Scaglione knows what his pellets of "dog food" are really worth.]*

Q. Okay. Did you have --

Q. At this point in time, so you had purchased the art work. You talked to Park West. You talked to Ms. Ashley's associate and then you talked to these art galleries, at that time had you spoken to any of the defendants in this case?

A. No, I haven't.

Q. So you had not spoken with Theresa Franks at this time?

A. Not at that particular time.

Q. You had not spoken with David Phillips?

A. No.

Q. You had not spoken with Bruce Hochman?

A. No.

Q. Had you spoken with Fine Art Registry at that time?

A. No, I did not.

Q. Okay. Now if you could give me a yes or no answer to this question it would help me out. Okay?

A. Absolutely.

Q. Okay. After speaking to these art dealers, the fifteen to twenty and finding out whatever information you found out, did you do any research on the Internet specifically about Park West?

A. Yes.

Q. Okay. And without telling me what exactly you saw or the content of any of it, can you tell me whether there was one website writing about Park West or more than one website writing about Park West?

A. Multiple websites.

Q. Okay. Was there one website writing negative things about Park West or more than one website writing negative things about Park West without telling me what exactly they said?

*[The reason why Valilila couldn't mention exactly what the web sites said is because Park West Gallery had the Judge tie our hands. We couldn't mention lawsuits filed against Park West. We couldn't mention news reports. We couldn't mention law enforcement investigations or dozens of other things. It was like a boxer fighting with two hands tied behind his back.]*

MR. YOUNG: Objection. Hearsay, your Honor.

MR. SCHWARTZ: I am asking him what he observed.

THE COURT: I will take the answer to that question.

THE WITNESS: The majority of what I read was negative.

*[Yes, indeed it was negative and it wasn't just Fine Art Registry that had reported negative things about Park West Gallery. For example, Ripoff Report.com had fraud reports on Park West Gallery dating back to at least 2004 and so did a number of other web sites that preceded Fine Art Registry. We only started reporting on cruise art auction sales in May 2007.]*

BY MR. SCHWARTZ:

Q. Okay. Now, in your internet research after you had spoken to those other galleries, did you find Fine Art Registry website?

A. Yes, I did.

Q. Did you contact Fine Art Registry?

A. Yes, I did.

Q. Okay. Do you recall who you spoke to?

A. David Phillips.

Q. Did you speak to Mr. Phillips by telephone or e-mail?

A. Both.

Q. Did you tell Mr. Phillips about your experience purchasing art work from Park West?

A. Yes, I did.

Q. Did you tell Mr. Phillips everything that had been told to you by either the auctioneers or those art companies?

A. Yes.

Q. Did you provide Mr. Phillips with a documentation you received from Park West about your purchase of art work on the three cruises and the land auction?

A. Yes, I did.

Q. Okay. At any time did Mr. Phillips tell you that you had --

MR. YOUNG: Objection. Leading. your Honor.

*[Oh, that whiny, pesky, little Rodger Young. We couldn't even complete a question without him popping up out of his chair, fearing what Valilila might say next.]*

MR. SCHWARTZ: If I could get the question out -- I don't think this is a leading question.

THE COURT: Let me hear it.

BY MR. SCHWARTZ:

Q. At any time, did Mr. Phillips tell you that you had to be a Fine Art Registry member in order to get assistance from Fine Art Registry?

MR. YOUNG: Objection. Leading, your Honor.

THE COURT: Mr. Schwartz?

MR. SCHWARTZ: I don't believe it's leading but I can rephrase if your Honor would like me to.

THE COURT: Rephrase.

BY MR. SCHWARTZ:

Q. Did Mr. Phillips tell you about the FAR membership?

A. No, he didn't.

Q. Did Mr. Phillips provide you with any information about what he believed to be the true value of the art work you purchased from Park West?

A. Yes, he did.

Q. Okay. Was this information consistent with the other research that you had done?

A. Mr. Phillips was generous with the numbers that he gave me. The other research I had done, the values were much lower than the values that Mr. Phillips had given me.

Q. Okay. So, Mr. Phillips was being kind?

A. He was being generous.

Q. At any time did Mr. Phillips suggest that you take your Dali prints to a Dali expert?

A. Yes, he did.

Q. Okay. Do you know if Mr. Frank Hunter who testified in this case ever examined your Dali?

A. Yes, he did.

Q. Okay. And do you know what Mr. Hunter concluded about the three Dali purportedly signed prints that you purchased from Park West?

A. They were all fake signatures.

Q. Did you also understand that Mr. Hunter testified that the Saint George And The Dragon is a fake print with a fake signature?

A. That's what I was told, yes.

Q. So if somebody says this case is only about fake signatures, they would be incorrect?

A. Absolutely.

Q. Okay. Are you aware that in addition to Mr. Hunter, Nicholas Deschames and handwriting expert Bill Flynn also concurred that the signatures --

BY MR. SCHWARTZ:

Q. Are you aware as to what Mr. Bill Flynn determined about these signatures on the Dali prints you bought from Park West?

A. Yes, I am.

Q. And what is your understanding?

A. That they are fakes.

Q. Mr. Valillio, do you believe you have been ripped off by Park West?

A. Ripped off is a light way of putting it. I believe that I have been abused by Park West.

Q. Why do you believe that?

A. This whole thing is a total sham. It's a total rip off. These guys are worse than the Mafia. They took my money and my kids' money and when I asked them to work something out with me to return it I was told all sales were final. Have a nice day.

Q. Sir, how did your dealings with Park West make you feel?

A. Like a schmuck.

Q. Okay. Getting back to Mr. Phillips, did Mr. Phillips do an article or a case study about your purchase of art work from Park West?

A. Sorry?

Q. Did Mr. Phillips do an article or a case study about your art buying experience from Park West?

A. Yes, he did.

MR. SCHWARTZ: Your Honor, may I approach the witness?

THE COURT: Yes, you may.

BY MR. SCHWARTZ:

Q. Mr. Valillio, I am approaching you with redacted exhibit 525. Do you recognize this article?

A. Yes, I do.

MR. SCHWARTZ: Your Honor, I have a copy for you.

THE COURT: Has that been received?

MR. SCHWARTZ: Not yet.

THE COURT: Yes, I will take a copy.

BY MR. SCHWARTZ:

Q. Sir, is this the FAR article that talks about your art buying experience?

A. Yes, it is.

Q. Okay. And can you tell me what the title of the article is? I think you did before.

A. All Sales Are Final. Thank You. Have A Good Day.

Q. Sir, the title is, All Sales Are Final. Thank You. Have A Good Day, Is that a phrase you had heard before?

A. That's a phrase that I received from Laura Mackey in an email which I have a copy of if you would like to see it.

Q. So Laura Mackey, Park West employee, told you in response to your concerns about the art work or your desire to sell it that all sales are final.

A. If you have no objections, I will read it for you.

Q. I think we may get an objection to that because it's not an exhibit. But, I will just -- can I take a look at it?

A. Sure.

Q. Sir, this is an email you received from Laura Mackey?

A. Yes, it is.

Q. Okay. And what is the date on this e-mail?

A. October 21st, 2008.

MR. SCHWARTZ: Your Honor, with your permission, I would like to introduce this e-mail as an exhibit. It has not been previously marked but I could mark it as exhibit 1165.

THE COURT: Okay. You can mark it.

MR. SCHWARTZ: Your Honor, I would like to move for the introduction of exhibit 1165.

THE COURT: Any objection to 1165?

MR. YOUNG: We haven't seen it, your Honor. Your Honor, this is totally objectionable based upon the conversations that we had in this courtroom for a couple of weeks including about thirty-five minutes ago. This is -- we very much object to the admission of this. It's inappropriate, it's wrong. It's inaccurate.

*[This exchange is representative of the redaction of the Fine Art Registry documents that Park West Gallery insisted on. It shows just what ridiculous lengths Park West went to in order to keep the FULL evidence from reaching the jury. Keep in mind that our defense to the defamation claim by Park West Gallery was to present the TRUTH. Park West Gallery and Rodger Young did not want the truth to be told which is so obvious here.]*

MR. SCHWARTZ: Your Honor, I am only moving for the admission of this middle article. I can cut off the top and the bottom. I can redact that. I would move for the admission of just this article in the middle. I think the objections were for the e-mails above and below it.

MR. YOUNG: That's exactly right, your Honor, and I very much object to the fact that he attempted to get the whole exhibit into evidence here.

*[Oh my, no! Fine Art Registry just couldn't be permitted to put the WHOLE truth -- the entire article we wrote on the Vallillo story before the jury. Park West Gallery couldn't have the jury knowing the truth of Vallillo's horrific experience with Park West Gallery. If Park West Gallery was on the up and up, what did they have to hide? Plenty!]*

THE COURT: Well, do you have an objection if it is redacted?

MR. YOUNG: No.

MR. SCHWARTZ: Your Honor --

THE COURT: Do you need some scissors?

*[So ridiculous... Scissors? Really? If this writer was not an eyewitness to this fiasco at Park West Gallery, well I wouldn't have believed it.]*

MR. SCHWARTZ: If I could have some here.

THE WITNESS: Can you make a copy of that before you cut it up being that's an original?

THE COURT: That's a great idea. Let's make a copy, mike. Make a couple copies of that. And we will have the presentation of the scissors ceremony and you can cut that up and remark it.

MR. SCHWARTZ: Thank you, your Honor.

THE COURT: Thank you for thinking of that.

THE WITNESS: No problem.

BY MR. SCHWARTZ:

Q. I can move on while we are waiting for that.

THE COURT: Okay. I will receive 1165 as redacted.

MR. SCHWARTZ: Thank you, your Honor.

BY MR. SCHWARTZ:

Q. Sir, do you believe that the story published by Fine Art Registry accurately represented your art buying experience from Park West?

A. Yes, it is quite accurate.

Q. Okay. Did you read the article and approve it before it was published by Fine Art Registry?

A. Yes, I did.

Q. This is a simple yes or no question, without getting into too much. Has Park West ever given you a refund?

A. No.

Q. Have you notified the cruise lines of what happened to you?

A. Yes, I did.

*[And they did nothing and continue to do nothing to make it right many victims, including Sheron Day and Julian Howard.]*

Q. Have the cruise lines ever given you a refund?

A. No.

Q. Did you know that the cruise lines got a cut of the sales of art to you?

A. Yes.

Q. Is that a reason you called them and asked for a refund.

A. Absolutely.

Q. Do you believe the cruise lines are somehow complicit in the sale of this art work to you?

A. Definitely.

Q. Sir, in your opinion, do you believe that Park West is engaged in unethical conduct?

A. Unethical, criminal activity. Like I said before, I think they are worse than the Mafia. Only difference, the Mafia is being put in jail everyday and they haven't been.

BY MR. SCHWARTZ:

Q. Mr. Vallillo, I'm handing you what's been marked as exhibit 1165. Sir, can you read who this e-mail is from and the date of the e-mail, please?

A. Sent from Laura Mackey at Park West Galleries. Sent on Tuesday October 21st, 2008 at 1:25 p.m. It was sent to myself and it reads, Dear Mr. Vallillo, per your request here is a recap of our conversation. I advised the Park West position has not changed and that per your signed invoices all sales are final. In regards to the Dali provenance, this will be sent to you shortly. I apologize for any inconvenience that this may have caused. Thank you. Have a good day. Kind regards. Laura Mackey. Park West Galleries, client service supervisor.

*[The Park West Gallery Dali so-called "provenance" is a thing to behold -- cheesy photocopies, data forgeries, and much of it in a foreign language, having absolutely NOTHING to do with the artwork the buyer purchased and supported by the flawed and nutty opinions of Bernard Ewell.]*

Q. Okay. And in that first full sentence or the end of the first full sentence, there is something in quotes. Can you read that for me?

A. All sales final.

Q. Sir, you expressed some pretty critical positions of Park West. Is your opinion about Parkwest solely based on what Fine Art Registry told you?

A. Absolutely not.

Q. Is your opinion of Park West solely based on what Theresa Franks told you?

A. Absolutely not.

Q. Is your opinion about Park West based solely on what Mr. David Phillips told you?

A. Absolutely not.

Fine Art Registry sincerely appreciates the testimony of Mike Vahilo, who took time away from his business and his family, traveling from his home in New Jersey to Port Huron, Michigan, to testify on our behalf. We hope to return the favor in November, 2011.

It is important to note too that all of the Park West Gallery victims that testified for Fine Art Registry in this case were subjected to harsh, abusive, and disrespectful treatment by Park West Gallery lawyers, Rodger Young and Jaye Quadrozzi; but this came back to bite Young and Quadrozzi in the form of a scathing jury verdict against their client, Park West Gallery. Jury members communicated to us after the trial that they thought Rodger Young was arrogant and mean-spirited when dealing with the victims as well as with his own staff and that Jaye Quadrozzi acted like a "witch." Gee, where have I heard that before? Oh, that's right, Litigation Update No. 12.

Fine Art Registry will be there to testify on your behalf, Mr. Vahilo, when it's time to turn the tables on the self-proclaimed largest art gallery on planet earth.

Stay tuned for more articles on the Federal Court trial testimony in the near future.

— by Fine Art Registry™ | Mar 25, 2011

Discuss on FARⓇ Forum  |  Print  |  Email

Like                          2                          0Share

The World's First Online Permanent Registry and Marketplace for Fine Art and Collectibles!
*Join* FINEARTREGISTRY:
CLICK HERE!

Similar articles by category  |  Art Article Index »

• Legal » Park West Gallery Lawsuits

• FAR® Investigation Reports » Cruise Line Art Auctions

• Art Crime » Art Auctions

back to top

The views and opinions of individual authors/contributors expressed on the FAR® web site do not necessarily state or reflect those views and/or opinions of Fine Art Registry® or its agents or subsidiaries.

| Fine Art Registry® | Art Gallery & More | Members | Support | Community Websites |
|---|---|---|---|---|
| Home | Online Art Gallery | Join FAR® | Help Desk | FAR® Store |
| Media Center | Featured Artists | Member Login | FAQs | Fine Art Advocacy |
| About Us | Stolen Art Database | Member Screenshots | What is FAR? | Dali Prints Investigation |
| Contact Us | Art Related Articles | Refer a Friend | How FAR Works | Forensics in Art |
| Advertising & Licensing | Art Related Videos | Agreements & Policies | Login Trouble | Art Videos and Media |
| Our Partners | Hot Art News | FAR On Your Side | Tag Registration Trouble | Art Auctions & Classifieds |
| Testimonials | International Art Events | FAR Web Store | Tag Ownership Transfer | |
| Sitemap | Art Blog | | Activate Your Tags | |
| | Art Forum | | | |

Fine Art Registry®, FAR® and the Fine Art Registry Logo are registered trademarks of Global Fine Art Registry, LLC. Helping Bring Order to the World of Art™ is a trademark of Global Fine Art Registry, LLC.

Copyright © 2003-2011 Global Fine Art Registry, LLC. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed without express permission.

Case 1:12-cv-03007-GAF Document 1 Filed 04/16/12 Page 49 of 55

# EXHIBIT 4



**FINE ART REGISTRY®**
Art & Collectible Registration System

Welcome! Login, or sign up.

Home ›   Art Search ›   Site Search ›   Contact Us ›   Shop ›



## Articles

- Index
- FAR Protect & Preserve
- FAR Investigative Reports
- Video Library
- Recent Art News & Articles
- Articles by Category
- FAR Columnists
- Write for FAR®

See also:

- Featured Artists
- Music, Food and Art
- Question about Art? Ask Us

**Fine Art News Feed**



FAR Help Desk 🔌

Search FAR Art Gallery 🔍

Join FAR Today! 🔌

## Latest Art News & Articles

- Round 2 – Defendants Park West Gallery and Royal Caribbean to Face Victims and FAR® in Nov. 2011 Jury Trial
- Pre and Post Sale and Art Deco Periods in Furniture
- The Virgin of Guadalupe and Ouranos: A Comparison of Fine Art Female Deities
- An Artist's Prejudice, The Accidental Portrait of a Strong-Minded Woman
- The Ancient Art and Craft of Glass-Making
- Antique Auction Forum Interviews Ted Franks
- Buying Art at Sea, Don't Blame the Victim, Blame the Cognitive Schema
- Victory the Shackles of Artists Past
- ART Viewed Through Prism of 12½'s Eye - Part 2
- Art Deco in the 21st Century

**View all Articles**

FAR Newsletter Sign-Up

Email [          ]   [Join]

**Art For Sale**

FAR Library › Legal   Park West Gallery Litigation › Round 2 – Park West Gallery Litigation Update #77

## Round 2 - Park West Gallery Litigation Update #77:

### Defendants Park West Gallery and Royal Caribbean to Face Victims and FAR® in Nov. 2011 Jury Trial

by Theresa Franks, for Fine Art Registry®

[Share] [icons]



It has been some time since our last update as it relates to Park West Gallery and all of the related litigation that is ongoing, but it certainly does not mean that our investigation into cruise ship art auctions has ended or that we are no longer receiving complaints from buyers and auctioneers. In fact, we are receiving more complaints than ever from cruise passengers who have purchased artwork recently and in the past from Park West Gallery. We have also been receiving intelligence on other art vendors who have replaced Park West Gallery on cruise ships. For example, we recently learned that British American Auctions has been taken over by Ira Shore, who has quite a history with Albert Scaglione. Not long ago, we reported that Ira Shore was recruiting Park West Gallery auctioneers and we have written about the relationship between the two men extensively. (See Park West Gallery and Plymouth Auctioneering Services, Ltd. - The Perfect Sham) There is much, much more information we have received recently, but at this time, we are holding this important intelligence close to our vests and sharing it only with those that need to know. Accordingly, we have been working and preparing behind the scenes, and we will report on what we have and continue to discover in the future -- if indeed we are at liberty to publicly divulge it. We appreciate the participation of individuals in the worldwide community who supply us with vital and important information that assists in our continued investigations into art fraud and crime.

At the present time, we are busy preparing for the next trial featuring Park West in the latest...

A jury trial is currently scheduled in the Shaun Day case, also known as the Best, et al. v. Park West Gallery case for November of this year in Michigan, Oakland County Circuit court, and it has been a very long time coming. The defendants, Park West Gallery, Royal Caribbean, and their respective legal teams have pulled every legal trick and maneuver known to man to try to escape the inevitable -- but appears are running out for this one and in our opinion, it is a virtual certainty that short of an enormous agreed upon settlement with the victims, Park West Gallery and Royal Caribbean will most certainly face an insurmountable challenge at trial. Remember, Royal Caribbean is used to litigating in Florida -- where the law is heavily in its favor and where they bask in protections not afforded to the cruise lines in other states, like Michigan.



The Great Park West Cruise Ship Half Million Dollar Swindle

Yes, Royal Caribbean will be joining Park West Gallery at the defense table. As we said early on, one has to seriously wonder about the logic behind Royal Caribbean's decision to risk its reputation and brand by aligning with and appearing at trial, lock step with its jilted concessionaire/vendor, Park West Gallery, especially when you consider all of the shocking evidence and testimony that the victims and Fine Art Registry will be divulging. The old adages usually always hold true: "You are known by the company you keep" and "perception is reality". The inextricable ties between Royal Caribbean and its revenue partner, Park West Gallery, will be laid bare at trial with a great big scoop of some amazing evidence to be revealed that Royal Caribbean (and Park West Gallery) up to this point know absolutely nothing about.

As a reminder, Royal Caribbean terminated its contract with Park West Gallery a year ago after Fine Art Registry won a unanimous jury verdict in Federal Court, and after a death threat was made from the corporate offices of Royal Caribbean to this writer. So, why would Royal Caribbean want to advertise to the world its co-defendant status with Park West Gallery (considering its reputation)? We don't think they do. It would be PR suicide. Yet, we wonder about Royal Caribbean's litigation strategy. For example, is Royal Caribbean truly aligned with Park West Gallery or has Royal Caribbean (at some point over the last three years or so) threatened to sue Park West

Round 2 – Park West Gallery Litigation Update #77, Fine Art Registry article – park west gallery laws...

Case 1:12-cv-03007-CM Document 1 Filed 04/16/12 Page 51 of 55



**Christmas Nativity**
**by: Lynnette Crisky**





**BLICK**
**art materials**



**20% off**
**YOUR ORDER**
**SHOP NOW**

so many beads ..

**bead.com.com**

Gallery for the sale of many fraudulent and spurious Dali prints sold aboard Royal Caribbean and Celebrity ships? Will or have the two companies pointed the finger at each other -- in the ultimate blame game?

Whatever the case, it is a fact that Royal Caribbean's hands are far from clean as they have shared heavily in the profits from the sale of artwork aboard its ships and especially as it relates to the victims, Sharon Day and Julian Howard. In our interview with the Park West Gallery auctioneer (Nick Dobreta) last year, he revealed to us that he was instructed by Park West Gallery, to manufacture and/or fabricate a Park West Gallery invoice in order to make it appear as if the sale of the set of forged Dali woodcuts occurred on ship (mind you, this was months after Day and Howard had sailed with Royal Caribbean), and further reported to us that Royal Caribbean received well over $100,000 as its cut of the Park West Gallery sale -- even though Day and Howard never sailed on the ship indicated on the invoice and never attended an auction as indicated on the invoice. In fact, Day and Howard were at home in the UK on terra firma when the sale was made by salesman, Morris Shapiro from the Southfield, Michigan gallery—hundreds of miles from any sea port or cruise ship. What's more, Day and Howard were instructed by Shapiro to wire the purchase money directly to Royal Caribbean's Bank of America account in Texas, which they did.

Royal Caribbean hasn't a clue about the evidence Fine Art Registry has been keeping dry in the vault that evidences Royal Caribbean's notice and knowledge of exactly what was going on aboard its cruise ships with its darling vendor/concessionaire, Park West Gallery, though long ago, we offered to sit down with cruise line executives to show them what we had in the hope they would be concerned enough about the financial safety of its passengers to take action. But Royal Caribbean elected profits over people and so they allowed Park West Gallery to continue until our victory at trial last year. While we applauded Royal Caribbean for finally dumping Park West Gallery as a vendor on its ships; there's still a lot of explaining to do and a lot of victims still left holding worthless artwork for which they paid princely sums all with the Park West Gallery empty and false promise of the artwork being "great investments."

Our readers might recall that Park West Gallery also sued Fine Art Registry in the Sharon Day/Best case, in essence blaming Fine Art Registry for the victims suing Park West Gallery -- making it the fifth SLAPP lawsuit Park West Gallery has filed against Fine Art Registry and others associated with Fine Art Registry, and each and every time for a whopping $46 million dollars. So far, Park West Gallery has lost miserably.

The victims are very much looking forward to having their day in court in November. Fine Art Registry has been prepared and ready for three years, and considering we were wildly successful at the Federal trial last year, even in spite of having to defend with two hands tied behind our backs and under the most dire of circumstances and with Park West Gallery cheating, lying, and manipulating every single day for five and a half weeks, we still managed a unanimous jury verdict in our favor, thanks to our advocate that never slumbers and never sleeps.

This coming trial in November will be a very different trial for Park West Gallery -- the only thing we expect to remain the same will be the ultimate outcome -- a jury verdict with a massive award for the victims -- as well as another defense verdict for Fine Art Registry, and hundreds of thousands in attorneys' fees that Park West Gallery will have to pay to the victims' lawyers.

From a defense perspective it certainly seems like a very foolish roll of the dice for Park West Gallery and Royal Caribbean to allow this case to see the light of a courtroom because this time they will be the DEFENDANTS and it's not a defamation case. Park West Gallery has put the victims through so much humiliation, suffering, and mental torture -- even to the extent of suing the victims for defamation — that Park West Gallery is sure to be rebuked, excoriated, and condemned by a jury for its vicious and vindictive treatment of the victims in this case. If the oh so brilliant Michigan legal team for Park West Gallery treats the victims like they did at the Federal court trial when they testified, it will not go well for them, just as it didn't go well for them a year ago when Fine Art Registry won a huge victory.

The victims more than earned their day in court and Fine Art Registry and our experts -- the very same experts that were at the Federal trial last year will be there to testify, save Frank Hunter. So, bring it on Park West Gallery and Royal Caribbean! We are ready and we are anxious to lay out the truth and the overwhelming evidence before another Michigan jury.

Fine Art Registry is looking forward to once again testifying to the truth -- but this time, we surely won't be bound and gagged from testifying to ALL of the truth as we were in the Federal court trial. Though they are certain to try, this time, Park West Gallery won't get away with murder by redacting documents and taking statements out of context. No, this time Park West Gallery won't be able to prevent this writer or Fine Art Registry, or the victims from testifying about things like law enforcement investigations and interviews, class action lawsuits and others, newspaper articles -- like the New York Times, The Independent, and The Arizona Republic, as well as television reports, witness intimidation, the ripping off their own artists, and all the rest of the evidence regarding the ugly truth about Park West Gallery's deceptive and unfair trade practices that we were precluded from testifying to at the last trial. This time, God willing, Royal Caribbean will be in the thick of it right along with Park West Gallery. The fact that Royal Caribbean has not insisted that Park West Gallery refund Sharon Day and Julian Howard and restore them financially is an outrage and the evidence Fine Art Registry has will bear this out.

The publicity of this upcoming trial will prove to be huge, and Fine Art Registry will make certain that everyone is well aware of it in advance. We have quite a following of people who are waiting to attend the next case against Park West Gallery. We will most certainly video blog daily about the trial, uploading to Facebook and Twitter all that is happening—just as was done in the Federal Court trial a year ago. Whatever the outcome of trial, the truth about Park West Gallery and the involvement of Royal Caribbean Cruise Line in the sale of spurious, fake, and forged artwork will be told.

The star of the trial will be the 100 crudely formed Dali woodcuts (represented at the time of sale by Morris Shapiro as "authentic," "complete" and "pristine" when it was nothing of the kind). The set was sold to Sharon Day and Julian Howard for an outrageous sum of approximately $450,000, and accompanied by a bogus appraisal signed by Albert Scaglione, valuing the set at a whopping $510,000. In addition to the expert testimony that will be offered at trial by Nicolas Descharnes and William Flynn, what follows is a preview of some of the other solid, documentary evidence we have gathered and that we will be introducing to the jury as incontrovertible evidence that Day and Howard and the other victims were scammed, evidence that cannot be denied by Park West Gallery or Royal Caribbean:

The well respected auction house, Bonhams & Butterfields (Bonhams) held a Fine Print Auction in San Francisco, California, on May 3, 2011. Bonhams was founded in 1793 and is one of the world's oldest and largest auctioneers of fine art and antiques. At the recent auction, Lot 63 - a full set of the Divine Comedy SIGNED BY DALI was sold for a hammer price of $134,000 (hammer price includes the Buyer's Premium of approx. 15% or so). Bonhams described the sale of the Divine Comedy set as follows:

"On May 3, 2011, Bonhams & Butterfields was honored to present its $1.6 -- million Fine Prints auction, marked by strong surrealism sales: the exceptional $134,000 purchase of Salvador Dali's La Divine Comédie, a complete signed portfolio of 100 color wood engravings from Dante Alighieri, L'Enfer, La Purgatoire, and Le Paradis, estimated at $50,000-70,000..."



**Divine Comedy Set Bonhams Print Sale**

It is important to note that prior to Bonhams offering the Lot for sale, the Divine Comedy Set was **authenticated jointly** by our experts, Frank Hunter of the Salvador Dali Archives in New York, and by Nicolas Descharnes of Descharnes & Descharnes in Paris. Note the original value estimate by Bonhams of $50,000 to $70,000. The hammer price of approximately $110,000 (exclusive of buyer's premium) is more than 75% less than what Sharon Day and Julian Howard paid for the Park West Gallery set of forged prints. The Bonhams set is believed to be one of the 150 sets hand signed by Dali for publisher, Jean Paul Schneider in the 1980s (and referenced in the Albert Field catalog – *The Official Catalog of the Graphic Works of Dali*). Fine Art Registry offered as evidence at the Federal trial two hand signed sets that belonged to Jean Paul Schneider and his partner Reine of Galerie Orangerie to compare to the bogus Park West Gallery signed set. The set sold at Bonhams on May 3, 2011, will be a third set to offer as proof positive that Sharon Day and her husband Julian Howard, were scammed and sold an incomplete, damaged, cobbled together, forged set of the Divine Comedy for nearly a half million dollars.

### Albert Scaglione Intimidating and Bribing Our Expert Witnesses

As this trial rapidly approaches, it appears that Albert Scaglione is becoming more and more desperate. He is up to his old tricks of intimidating and bribing our expert witnesses. This is nothing new. Park West Gallery did the same thing in the Federal court case. Predictable in his foolishness, Scaglione is desolate of integrity and scruples and his stupidly underestimates the loyalty and integrity of our experts. He obviously believes that money can buy everything and everyone. There is little doubt that Scaglione has a lot to worry about as the victims' trial approaches, in addition to the many jury trials of victims that are currently in the queue -- like the *Cohen, et al. v. Park West Gallery* case. After all, Al Scaglione is forced to rely on the bogus, unreliable, cockeyed opinions of the Mad Hatter of the Dali world -- Bernie Ewell. As the saying goes, the chickens are now coming home to roost. Instead of manning up and facing the music at trial with Ewell, what does Scaglione do? He has his thugs, his so-called "intermediaries" lie, manipulate, intimidate, and ultimately try to bribe our expert witnesses. That's right... Scaglione knows full well that if Park West Gallery is to stand any chance at trial now or in the future, he must do everything in his power to take out our excellent and very effective experts. Is there no end to this man's diabolical tactics? He is deceitful, underhanded, pathetic, and a coward.



One of the Sources of Park West Gallery's Desperation and Tribulation—Bernie Ewell

Will *Park West Gallery* dare call Ewell as a 'live' witness at the next trial? We sure hope so. And do they have a choice? It certainly will be worth the price of admission to observe Ewell on the witness stand again, especially after his oh so embarrassing testimony at the Federal trial. What the heck. What has Park West Gallery got to lose? EVERYTHING! And Scaglione knows it. Otherwise, if Scaglione was so cock fire sure of the strength of his case and if he had any faith at all in his loony expert, Ewell, (which he clearly does not) what reason would he have to try to bribe Fine Art Registry and the victims' experts?

Stay tuned for further updates. We have much, much more to share. Be sure to keep your eye on our Forum Posts as well. We will have some updates for you there in the near future.

Sign-up to Receive our Latest
News & Updates:

Enter email address...   [ Subscribe ]

Park West Gallery Litigation Updates

1. Park West Gallery and its Astounding Experts and Legal Contortionists
2. Park West Gallery Caught Between a Fock and a Hard Place?
3. Park West Gallery Homet's Nest of Litigation, Update on Nationwide Class Actions
4. Do Bernie Ewell or his Lawyer Have a Clue?
5. Park West Gallery: Up Against the Ropes and More Remarkable Developments
6. Park West Gallery Lawyers' Hasty Court Filing Throws Open Pandora's Box
7. Park West Gallery Drags Royal Caribbean into its Cesspit of Controversy
8. Corruption, Manipulation, Deceit and Worthless Park West Gallery Appraisals
9. Michigan Court Judge Enters Multiple Formal Judgments Against Park West Gallery

Round 2 – Park West Gallery Litigation Update #77, Fine Art Registry article - park west gallery laws...

Case 1:12-cv-03007-CM    Document 1    Filed 04/16/12    Page 53 of 55

10. Michigan Court of Appeals Spanks Royal Caribbean - AGAIN!

11. Six Distorted Amended Complaints Filed Against Paul West Gallery and Accomplices

12. Fine Art Registry to Square Off with Park West Gallery in Port Huron, Michigan

**New Video Series of Litigation Updates**

Fine Art Registry® invites you to tune into a series of new videos featuring CEO and Founder Teri Franks as she confronts the self-proclaimed "World's Largest Art Gallery" Park West Gallery. Brought to you as it happens! Be sure to stay tuned to the cliff hanger sequences.

Fine Art Registry Video - Intro to New Video Series of Litigation Updates

13. Litigation Update #13, Video Series

   1. Part 1 - "Bury the Truth", Park West Gallery Style

   2. Part 2 - Park West's Motion in Limine 1 and 2

   3. Part 3 - News Flash! Court Order on Park West's Frivolous Motion to Compel

   4. Part 4 - Park West's Motion in Limine 3 through 10

   5. Part 5 - "In Defense of Truth" Affidavit of CEO Teri Franks vs. Park West Gallery

   6. Part 6 - Park West's Motion in Limine 11 through 17

   7. Part 7 - "Oh the Drama"

   8. Part 8 - "It's An Eye Opener"

   9. Part 9 - "Fooling No One"

   10. Part 10 - Fine Art Registry Responds to Limine #12, Part 1

   11. Part 11 - Fine Art Registry Responds to Limine #12, Part 2

   12. Part 12 - Park West files Another Motion to Silence Fine Art Registry

   13. Part 13 - Park West enters into a game of "Dirty Pool"

   14. Part 14 - Outrageous Conduct Exhibited by Park West Attorneys

   15. Part 15 - Letter from Fed's and "Grand Jury Investigation"

14. Litigation Update #14, Video: Jury Trial in Michigan Begins

15. Litigation Update #15, Video: Michigan Trial - Day 2, Scanlona takes the Stand

16. Litigation Update #16, Video: Michigan Trial - Day 5, Fine Art Registry is Alive, Well and Still Fighting

17. Litigation Update #17, Video: Michigan Trial - Weekend Update

18. Litigation Update #18, Video: Michigan Trial - Albert Molina to Take the Stand Soon

19. Litigation Update #19, Video: Michigan Trial - Half Truths and Perverted Truths

20. Litigation Update #20, Video: Michigan Trial - Coming to the Stand Bob Wohman

21. Litigation Update #21, Video: Michigan Jury Trial-Day 6 - How Provenance Relates to Artwork - Part 1

22. Litigation Update #22, Video: Michigan Jury Trial-Day 6 - How Provenance Relates to Artwork - Part 2

23. Litigation Update #23, Video: Michigan Jury Trial-Day 7- Albert Molina-Just Bavolier Gross Distortions!- Part 1

24. Litigation Update #24, Video: Michigan Jury Trial-Day 7- Testimony of Park West VIP Customer "Backfires" - Part 2

25. Litigation Update #25, Video: Michigan Jury Trial-Day 9 - "Shady" European Sources of PWG Dali Prints

26. Litigation Update #26, Video: Michigan Jury Trial-Day 9 - Purported Signatures of Salvador Dali and Manufactured Blind Stamp-Part 1

27. Litigation Update #27, Video: Michigan Jury Trial-Day 9 - Park West Gallery Up to its Old Tricks-Part 2

28. Litigation Update #28, Video: Michigan Jury Trial-Day 9 - Book Entitled AFT CRIME Exposes Obama Similarities to PWG Dali Provenance-Part 3

29. Litigation Update #29, Video: Michigan Jury Trial-Weekend Update 3/26/10 - Revealing Emails from Park West Gallery Ex-Auctioneers - Part 1

30. Litigation Update #30, Video: Michigan Jury Trial-Weekend Update 3/28/10 - Raffiy Art Deception Exposed by PWG Ex-Cruise Ship Auctioneer -Part 2

31. Litigation Update #31, Video: Michigan Jury Trial-Day 10 - PWG Relies on Status of Ex-FBI Employee-Bob Wittman - Part 1

32. Litigation Update #32, Video: Michigan Jury Trial-Day 10 - Bob Wittman Handed Keys to Park West Gallery Kingdom - Part 2

33. Litigation Update #33, Video: Michigan Jury Trial-Day 11 and 12 - Hostile Witness Called!

34. Litigation Update #34, Video: Michigan Jury Trial-Day 13 - PWG "Star Witness" Barnard Ewell His Blog and Infamous Posts-Part 1

35. Litigation Update #35, Video: Michigan Jury Trial-Day 13- Park West Gallery "Expert" Ewell Puts on Spectacle(s) in Court - Part 2

36. Litigation Update #36, Video: Michigan Jury Trial-Day 14 - Park West Gallery Presents: A Drama, Starring: Mery Gordon and Cast - Part 1

37. Litigation Update #37, Video: Michigan Jury Trial-Day 14 - Another Hostile Witness - Publications Direct vs. David Phillips - Part 2

38. Litigation Update #38, Video: Michigan Jury Trial-Day 15 - Park West Damage Expert Simon Says: $66,000,000.00 in Damages! OUTRAGEOUS!!

39. Litigation Update #39, Video: Michigan Jury Trial-Day 15, Part 2 - Park West Gallery Sangpanger, Vamuches and Glasses Over Provenance

40. Litigation Update #40, Video: Michigan Jury Trial-Day 16, Part 1 - Park West Gallery Finds it a Case! An Anti-climax!!

41. Litigation Update #41, Video: Michigan Jury Trial-Day 16, Part 2 - Introducing World Renowned Dali Expert, Nicolas Descharnes from Paris

42. Litigation Update #42, Video: Michigan Jury Trial-Day 12, Part 1 - Park West Gallery Victim, Debbie Austin Testifies for Fine Art Registry

43. Litigation Update #43, Video: Michigan Jury Trial-Day 12, Part 2 - Object To This! Object To That! Object To Everything! Especially The TRUTH!!

44. Michigan Jury Trial-Day 19 - Three World Renowned Experts "Agree" PWG Dali Inventory Examined Prints "FORGED"

45. Michigan Jury Trial-Day 13 - Conversation With Fine Art Registry CEO and Dali Experts

46. Michigan Jury Trial-Day 20 - Park West Gallery and Counsel Laugh At Victims' Compelling Testimony! Where Are The Ethics???

47. Michigan Jury Trial-Week End Update 4/10/2010 - "How To Get Flim-Flammed At Sea" Told by PWG Ex-Auctioneers

48. Michigan Jury Trial-Week End Update 4/10/2010 Part 2 - "Send In The Clowns" A Too Best of Bogues Gallery!

49. Michigan Jury Trial-Week End Update 4/10/2010 Part 3 - Fine Art Registry Beginning 5th Week of Historic Art Trial

50. Michigan Jury Trial-Day 21 - PWG Bamunen Victim to Pay $26,000.00 In Hungry Orders for Art Purchased! - What???

51. Michigan Jury Trial-Day 22 - CEO Teri Franks Takes the Stand! "LET 'R' RIP"

52. Michigan Jury Trial - Day 23 - Fine Art Registry CEO Teri Franks Stands Her Ground!

53. Michigan Jury Trial - Day 24 - War Zone! Witnesses Testify of Park West Gallery Collateral Damage - Part 1

54. Michigan Jury Trial - Day 24 - Fine Art Registry Witness! Samantha Alger "There's A Point In Life Where You Have to Do The Right Thing!" - Part 2

55. Michigan Jury Trial - Day 24 - Sharon Day - PWG Victim Defrauded of Close to Half Million Dollars! - Part 3

56. Michigan Jury Trial - Day 24 - PWG Albert Scaglione Leaves Courtroom BEFORE Sharon Day Takes Stand! - Part 4

57. Michigan Jury Trial - Day 24 - Penny Tyler Exposes PWG Auctioneer Training on Land and Sea - Part 5

58. Michigan Jury Trial - Day 24 - Park West Gallery's Ex-Auctioneer & Former Trainee Speak Out! - Part 6

59. Michigan Jury Trial - Day 25 - We've Had Our Day In Court - FAR's Case Concluded! - Part 1

60. Michigan Jury Trial - Day 25 - Auctioneer Trainee for Park West Gallery DISMISSED! "Too Much Art Knowledge"

61. Michigan Jury Trial - Weekend Update 4/17/2010 - Divine Providence Allows Sharon Day to Testify for FAR's!

62. Michigan Jury Trial - Weekend Update 4/17/2010 - Sharon Day: "Without Fine Art Registry Where Would We Be?"

63. Michigan Jury Trial - Weekend Update 4/17/2010 - Park West Gallery Fabricates Bogus Invoice for Sharon Day and Julian Howard - Part 3

64. Michigan Jury Trial - Weekend Update 4/17/2010 - "Buyer beware Days Not Apply to Fraud" Sharon Day - Part 4

65. Michigan Jury Trial - Weekend Update 4/17/2010 - "That Little Plywood Box" Was Owned by PANDORA! - Part 5

66. Michigan Jury Trial - Weekend Update 4/15/2010 - Fine Art Registry Witness PWG Ex-Employee Lynn Mesritten Testifies to Oppressive Work Atmosphere - Part 6

67. Michigan Jury Trial - Weekend Update 4/18/2010 - Park West Gallery's Un-Limited Editions - Run Out? - Simply Print More! - Part 7

68. Michigan Jury Trial - Day 26 - We've Run the Race and Fought the Good Fight! - Jury Deliberates! Part 1

69. Michigan Jury Trial - Day 26 - Samantha Alger: Describes Court Proceedings Metaphorically - Part 2

70. Michigan Jury Trial - Day 26 - Sharon Day Back By Popular Demand - Part 3

71. Michigan Jury Trial - Day 26 - PWG Closing Argument.... Never Mentioned Defrauded Victims Who Testified - Part 4

72. Michigan Jury Trial - Day 27 - Royal Caribbean Cruise Lines Enables Park West Gallery Corruption to Continue!

73. Michigan Jury Trial - Day 27 - Holding Art Case! WE WON AND WE WON BIG!!

74. Michigan Jury Trial - Day 27 - Victorious and Homeward Bound!

75. Michigan Post Jury Trial - 4/27/2010 - Fine Art Registry CEO Speaks With Her Legal Team: Donald Payton and Jonathan Schwartz of Kaufman, Payton and Chapa P.C.

**New Post Trial Video Series: Truth to Power**

76. Litigation Update #76 - BREAKING NEWS on Fine Art Registry's Jury Verdict

77. Litigation Update #77 - Round 2: Defendants Park West Gallery and Royal Caribbean to Face Victims and Fine Art Registry in November 2011 Jury Trial

-- by Theresa Franks | May 9, 2011

Discuss on FARE Forum | 🖶 Print | ✉ Email

 Tweet   2   [🔲🔲🔲]0 Share

Become a member today! Click here to join
*Fine Art Registry™*

**Similar articles by category** | Art Article Index •

- Legal • Park West Gallery Lawsuits
- FAR's Investigative Reports • Cruise Line Art Auctions
- Art Crime • Art Auctions

back to top

The views and opinions of individual authors/contributors expressed on the FAR's web site do not necessarily state or reflect those views and/or opinions of Fine Art Registry™ or its agents or subsidiaries.

Case 1:12-cv-03007-CM   Document 1   Filed 04/16/12   Page 55 of 55

Round 2 – Park West Gallery Litigation Update #77, Fine Art Registry article - park west gallery laws...

| Fine Art Registry® | Art Gallery & More | Members | Support | Community Websites |
|---|---|---|---|---|
| Home | Online Art Gallery | Join FAR's | Help Desk | FAR's Store |
| Media Center | Featured Artists | Member Login | FAQs | Fine Art Advocacy |
| About Us | Stolen Art Database | Member Screenshots | What is FAR? | Dali Prints Investigation |
| Contact Us | Art Related Articles | Refer a Friend | How FAR Works | Forensics in Art |
| Advertising & Licensing | Art Related Videos | Agreements & Policies | Login Trouble | Art Videos and Media |
| Our Partners | Hot Art News | FAR On Your Side | Tag Registration Trouble | Art Auctions & Classifieds |
| Testimonials | International Art Events | FAR Web Store | Tag Ownership Transfer | |
| Sitemap | Art Blog | | Activate Your Tags | |
| | Art Forum | | | |

Fine Art Registry®, FAR'S and the Fine Art Registry Logo are registered trademarks of Global Fine Art Registry, LLC. Helping Bring Order to the World of Art™ is a trademark of Global Fine Art Registry, LLC.

Copyright © 2003-2011 Global Fine Art Registry, LLC. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed without express permission.